JOEL BAN, Utah Bar No. 10114
Ban Law Office PC
Post Office Box 118
Salt Lake City, Utah 84110
Telephone: 801-532-2447

MICHAEL RAY HARRIS, *pro hac vice pending*
Friends of Animals
Wildlife Law Program
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 802110
Telephone: 720-949-7791
Fax: 888-236-3303

Attorneys for Friends of Animals

---

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

Civil Action No.__________

FRIENDS OF ANIMALS, a non-profit corporation;

Plaintiff,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, an agency within the United States Department of Interior;

Defendant.

---

**PROLOGUE**



A Prairie Dog Town. Courtesy of Wildlife-Animals.com.

*Prairie dogs find their distinct origins in the Pleistocene era. They embody two million years of evolving intelligence.*

*Prairie dogs have a significant effect on biological diversity in prairie ecosystems. More than 200 species of wildlife have been associated with prairie dog towns, with over 140 species benefiting directly, including bison, pronghorn antelope, burrowing owls, pocket mice, deer mice, ants, black widow spiders, horned larks, and many predators such as rattlesnakes, golden eagles, badgers, bobcats, weasels, foxes, coyotes, and especially black-footed ferrets.*

*Prairie dogs create diversity.*
*Destroy them, and you destroy a varied world.*

Terry Tempest-Williams
*Finding Beauty in a Broken World (2008)*
Annie Clark Tanner Scholar in
Environmental Humanities,
University of Utah

*The Utah Prairie Dog is one of the six species identified, worldwide, as most likely to become extinct in the twenty-first century.*

Niles Eldredge
*A Field Guide to the Sixth Extinction*
The New York Times Magazine
December 6, 1999

**INTRODUCTION**

1. Through this action, Plaintiff, Friends of Animals, challenges the April 2018 decision of the United States Fish and Wildlife Service (FWS) to issue a Range-Wide General Conservation Plan (GCP) and related master incidental take permits (ITP) under the Endangered Species Act (ESA) to Iron, Beaver, and Garfield Counties (hereinafter "the counties") authorizing the take of Utah prairie dogs, a threatened species, on non-federal lands.

2. The history of the Utah prairie dog is one of continued conflict between the protection of this species and its unique habitats and the desire for economic growth and development in these essentially rural counties. Starting in the 1920s and continuing up until the species was granted protection in 1973, the Utah prairie dog has been subject to poisoning campaigns and the target of indiscriminate shooting by agricultural and other economic interests. Once listed under the ESA, local and state interests have continuously sought less restrictions from the federal government on take of prairie dogs. Prior to April 2018, federal regulations, which were last updated in 2012, granted unrestricted take for purposes of protecting agriculture, to prevent serious human safety hazards, or to protect the sanctity of human cultural or burial sites. Dissatisfied with these federal concessions, which are heavily criticized by members of the conservation community, some residents from the counties (with local government support) sued in federal District Court to invalidate all regulation of Utah prairie dogs on non-federal lands under the U.S. Constitution. That challenge was ultimately rejected by the Tenth Circuit Court of Appeals and the United States Supreme Court.

3. The April 2018 decision is by far the most indulgent rules issued by the federal government pertaining to Utah prairie dogs and appears to be an attempt to appease the counties in their relentless drive for economic growth and development at the expense of these threatened animals. The decision authorizes unlimited take across the entire range of the Utah prairie dog, with developers encouraged to translocate the prairie

dogs only when deemed "feasible." The GCP offers no real limit on take, relying on estimations rather than defining an upper limit. It offers no enforcement mechanism or penalties for developers or the counties if the estimated take is exceeded. And it leaves uncertainty as to when mitigation would be required.

4. In short, the GCP and ITP, which will replace previous habitat conservation plans (HCP), fail to include even the minimalist restrictions on take previously in place, and abandons most current mitigation measures in favor of simply moving prairie dogs out of the way when feasible. FWS has clearly acknowledged that if the decision is implemented there might be a significant take (loss) of Utah prairie dogs. In fact, even when a developer chooses to implement the relocation provisions, up to 90% of moved prairie dogs can be killed.

5. Because of these deficiencies, FWS's decision does not meet the substantive and procedural requirements of two federal laws—the ESA and the National Environmental Policy Act (NEPA).

6. Under the ESA, one seeking permission for incidental take must, among other things, (1) adequately mitigate and minimizes the impact to the take of Utah prairie dogs and (2) ensure that any take does not increase the likelihood of Utah prairie dog surviving in the wild. FWS has not explained how either of these two conditions are met by the GCP and ITPs. FWS concludes that by establishing one to three 400-acre translocation sites, it will completely mitigate the destruction of 350 to 1750 acres of occupied Utah prairie dog territory. This conclusion is erroneous for several reasons.

7. First, it ignores the amount of actual prairie dogs on each site and the importance of those prairie dogs to continued survival of the species. FWS has defined a "successful" translocation site as having a spring count of 1. This means after bulldozing 350 acres of occupied prairie dog habitat and taking 1714 prairie dogs (FWS historic estimate), so long as there is an estimated population of 7.2 (spring count of 1) prairie dogs at the translocation site, it is considered a complete and successful mitigation.

8. Second, FWS's conclusions assume that translocation will occur at rates higher than the historical average. However, there is no reason to assume that developers will choose to translocate more than they have in the past. To the contrary, FWS is abandoning incentives contained in previous conservation plans to translocate prairie dogs impacted by new development. Even with the incentives from previous plans, less than one out of four developers chose to translocate, on average.

9. Third, FWS does not identify where the 1200 to 3600 acres of land for translocations is and if its available amongst competing uses for federal land. According to FWS, it needs approximately 3600 acres to establish 1200 acres of successful prairie dog habitat given that 66% of translocation sites fail.

10. FWS has not established or identified where this habitat is located or if its available. Identifying the translocation sites before allowing the destruction of prairie dog habitat is both sensible and legally required.

11. Finally, there is no upper limit on the amount of take. FWS bases its assessment of the impact to prairie dogs under the GCP using estimates, but the GCP does not, as previous HCPs have, put an upper limit on the take of prairie dogs or their habitats. Without a measurable limit, a boom in growth and development could outpace the estimates and result in severe impact to the prairie dogs. There are no enforcement measures to avoid this possibility.

12. The decision also violates NEPA, which requires FWS to carefully consider a wide range of alternatives, and to vigorously examine the environmental impacts of each alternative to issuing the incidental take permits. FWS did not do so here. Essentially, FWS considered alternatives that were either similar, or assumed that they would be granting permits to individuals regardless of whether the GCP was approved. FWS did not consider a greater mitigation alternative, such as restrictions on development, protection of specific crucial colonies and connective corridors, or even a take limit.

13. At the very least, FWS was required to resolve the uncertainty associated with the issuance of the master incidental take permits under this GCP by preparing an environmental impact statement (EIS).

14. In making its decision, FWS acted arbitrarily, capriciously, and most importantly, inconsistent with NEPA and the ESA. Thus, Friends of Animals asks the Court, pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706, to vacate and remand the decisions approving GCP and ITPs, and to enjoin FWS from allowing implementing of actions authorized by the decision.

**PARTIES**

15. Friends of Animals is a non-profit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals has nearly 200,000 members worldwide, including many that live or visit Iron, Beaver, and Garfield Counties.

16. Friends of Animals brings this action on its own behalf and on behalf of its adversely affected members. Friends of Animals regularly informs its members about animal advocacy issues, like the issuance of master ITP permits to Iron, Beaver, and Garfield County, as well as the organization's progress in addressing these issues, through its magazine called *ActionLine*, its website, and other reports.

17. Friends of Animals is harmed by Defendant's decision to authorize the take of Utah prairie dogs pursuant to Iron, Beaver, and Garfield Counties' master ITPs. First, the decision to issue these permits without complying with NEPA debilitates Friends of Animals' efforts to inform and educate about these issues and prevents Friends of Animals and its members from having meaningful input into FWS' decision to issue the GCP and related ITPs to Iron, Beaver and Garfield Counties. Second, many of Friends of Animals

members regularly view, study, and photograph Utah prairie dogs in and around Iron, Beaver, and Garfield Counties. These members receive considerable pleasure and enjoyment from observing Utah prairie dogs in their natural habitat. Due to Defendant's violations of federal law in issuing the ITP, these members' opportunities to observe Utah prairie dogs will decrease. Third, Friends of Animals members enjoy recreating in Iron, Beaver, and Garfield Counties, and Defendant's actions reduce the value of these areas for such use by these members by ruining the aesthetic beauty, sanctity, peacefulness and serenity of these areas, and by inhibiting Friends of Animals members' ability to view and enjoy Utah prairie dogs.

18. Defendant, United States Fish and Wildlife Service, is an agency within the United States Department of Interior. FWS is responsible for administering the ESA as it applies to threatened and endangered mammal species, including Utah prairie dogs, in accordance and compliance with federal laws. FWS is an agency within the meaning of the APA.

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under the ESA, NEPA, and the APA. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant. The relief sought is authorized by the APA, 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief).

20. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A). The events giving rise to the cause of action occurred in this judicial district and defendants maintain an office in this judicial district.

## LEGAL BACKGROUND

### A. Endangered Species Act.

21. Congress enacted the ESA to conserve endangered and threatened species and the ecosystems upon which these species depend. 16 U.S.C. § 1531(b).

22. The ESA prohibits the "take" of any endangered or threatened species, such as the Utah prairie dog. The ESA defines take broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Harm in the definition of take may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

23. The ESA also "affirmatively command[s] all federal agencies to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of an endangered species or result in the destruction or modification of habitat of such species." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978) (citing 16 U.S.C. § 1536).

24. Section 10 of the ESA provides a narrow exception to the ESA's take prohibition and allows FWS to issue an ITP authorizing limited take that incidentally result from otherwise lawful activity. 16 U.S.C. § 1539(a)(1)(B).

25. The ESA requires applicants wishing to obtain an ITP to submit a HCP that specifies: (1) the impact which will likely result from the taking; (2) what steps the applicant will take to minimize and mitigate such impacts, and the available funding to implement such steps; (3) what alternative actions the applicant considered and the reasons why such alternatives are not being utilized; and (4) other measures that the Secretary may require as being necessary or appropriate for the plan. 16 U.S.C. § 1539(a)(2)(A).

26. FWS must provide the public with an opportunity to comment on an applicant's HCP and application materials before determining whether to issue an ITP. 16 U.S.C. §§ 1539(a)(2)(B) - (c).

27. Before issuing an ITP, FWS must find, among other things, that: (1) the expected taking will be incidental; (2) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (3) the applicant has assured adequate funding for its HCP; and (4) the taking will not appreciably reduce the likelihood of the survival and recovery of listed species in the wild. 16 U.S.C. § 1539(a)(2)(B).

28. Before issuing an incidental take permit, FWS must also initiate and complete consultation under Section 7 of the ESA. Section 7 requires federal agencies to evaluate expected impacts to listed species and designated critical habitat before authorizing, funding, or taking any discretionary action. 16 U.S.C. § 1536(a)(2).

29. When a proposed agency action is likely to adversely affect a listed species, FWS must prepare a biological opinion. Biological opinions must be based on the best available science and must analyze whether the proposed agency action is likely to jeopardize any listed species or adversely modify any designated critical habitat. 16 U.S.C. § 1536(a)(2). If a proposed agency action will jeopardize a listed species or adversely modify designated critical habitat, FWS must suggest reasonable and prudent alternatives that will avoid jeopardy and adverse modification of designated critical habitat. 16 U.S.C. § 1536(b)(3)(A).

**B. National Environmental Policy Act.**

30. NEPA, 42 U.S.C. § 4321 *et seq*., is our nation's basic charter for environmental protection.

31. Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions. Second,

Congress sought to provide the public with a statutory means for being informed about, and to comment on, the environmental impacts of proposed agency action.

32. Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed analysis that discusses, among other things: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

33. An EIS must provide a full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. 40 C.F.R. § 1502.1.

34. In determining the scope of the required NEPA analysis, an agency must consider not only the proposed action, but also three types of related actions: "connected actions," "similar actions," and "cumulative actions." *See* 40 C.F.R. § 1508.25(a).

35. NEPA requires an agency to prepare an EIS when a proposed action significantly affects the environment. 42 U.S.C. § 4332(C). In determining whether an action may significantly affect the environment, an agency must consider: (1) the unique characteristics of the geographic area, such as proximity to ecologically critical areas; (2) the degree to which environmental effects of the proposed action are highly controversial; (3) the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and (4) cumulative impacts of its actions.

36. The Council on Environmental Quality's (CEQ) regulations, which implement NEPA and are binding on all federal agencies, state that "major federal actions" that require an EIS include actions approved by a permit. 40 C.F.R. § 1508.18(b)(4).

37. The CEQ regulations define "significantly," as used in NEPA, as requiring considerations of "both context and intensity." 40 C.F.R. § 1508.27. The CEQ regulations further describe "intensity" to include considerations of the degree of which the effect on

the human environment are likely to be highly controversial, the degree of which the possible effects are highly uncertain or involve unknown risk, and whether the action may adversely affect an endangered or threatened species or its habitat under the ESA. 40 C.F.R. § 1508.27(b)(4)-(5), (9).

38. The issuance of an ITP is a federal action subject to NEPA compliance. Depending on the impact of the HCP, NEPA requirements can be satisfied by a categorical exclusion, an environmental assessment (EA), or an EIS.

## FACTUAL BACKGROUND

### A. Utah Prairie Dogs.

39. Found only in North America, prairie dogs are social animals and a keystone grassland species.

40. Prairie dogs fertilize and aerate soil, reduce noxious weeds, and clip forage to create more nutrient-rich blades of grass. Larger herbivores, such as elk and bison, graze on areas occupied by prairie dogs. Numerous reptiles, amphibians, and invertebrates inhabit prairie dog burrows, and prairie dogs themselves are a food source for a variety of species. The diet of the endangered black-footed ferret, for instance, is 90% prairie dogs and a healthy population of black-footed ferret population requires very large prairie dog colonies. In addition to the endangered black-footed ferret, an estimated 150 species benefit from prairie dogs and the habitat they help maintain.

41. There are four species of prairie dogs in the United States, one of which is the Utah prairie dog (*Cynomys parvidens*).

42. The historic range of the Utah prairie dog was spread across eight counties in Utah and in the 1920s, the Utah prairie dog population neared 100,000.

43. Utah prairie dog eradication programs began sometime in the 1920s. Throughout the 1920s and 1930s, poisoning campaigns targeted prairie dogs on tens of thousands of acres each year. Such control programs left the population depleted. By the

1970s, the total population of Utah prairie dogs was 3,300. By 1995, the Utah prairie dog range was reduced to 6,997 acres. At the time, the species was predicted to become extinct by the year 2000.

44. FWS listed the Utah prairie dog as endangered under the ESA in 1973.

45. In 1979, the Utah Division of Wildlife and Resources (UDWR) petitioned for removal of ESA protection for the species.

46. While concluding that delisting was not warranted, FWS down-listed the species' status to threatened. In addition, FWS issued a special rule under section 4(d) of the ESA to permit the take of up to 5,000 Utah prairie dogs per year on non-federal lands.

47. In 1991, FWS revised the special 4(d) rule to allow take of up to 6,000 animals per year on non-federal lands throughout the species' entire range.

48. In 1991, FWS established a Recovery Plan to increase the Utah prairie dog population.

49. In 2012, the special rule was revised to allow take, without a permit, where Utah prairie dogs cause serious human safety hazards or disturb the sanctity of human cultural or burial sites. Such takes do not count toward the 6,000 annual take limit previously authorized.

50. The Utah prairie dog's current range is limited to the Southwestern quarter of Utah. According to Utah Division of Wildlife Resources' 2016 Report, there was a total spring count of 11,484 prairie dogs. Of these over 70% reside on non-federal lands.

51. The majority of the current population is found in three recovery units: the West Desert Recovery Unit, the Paunsaugunt Recovery Unit, and the Awapa Plateau Recovery Unit.

52. The West Desert Recovery Unit is predominantly within Iron County, with the northern portion extending into Beaver County. The Paunsaugunt Recovery Unit is mostly in Garfield County. Garfield County also encompasses a portion of Awapa Plateau Recovery Unit.

53. Approximately 70% of Utah prairie dogs now reside on non-federal lands that are available for commercial and residential development.

54. Permanent habitat loss and fragmentation caused by commercial and residential development remain a constant concern.

55. Over 95% of Iron County is within the West Desert Recovery Unit, which contains over 70% of all adult Utah prairie dogs.

56. Utah prairie dogs in Iron County experience the highest degree of habitat impact associated with urban expansion.

57. Beaver County encompasses most of the remaining portions of the West Desert Recovery Unit, minus a small southern extension into Washington County.

58. Garfield County comprises over 95% of the Paunsaugunt Recovery Unit with approximately 20% of all adult Utah prairie dogs residing within the recovery unit.

**B. Range Wide General Habitat Conservation Plan.**

59. On December 19, 2017, FWS published a Draft Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Development Areas ("the draft GCP").

60. On December 19, 2017, FWS solicited public comment on the draft GCP. FWS provided for a 30-day public review and comment period

61. Despite the significant length of the GCP and related materials, and despite issuing the draft during the holidays, FWS denied Friends of Animals' request for a modest 30-day extension to the public review and comment period.

62. On January 18, 2018, Friends of Animals submitted comments on the draft GCP requesting FWS prepare an EIS and consider additional alternatives.

63. On April 3, 2018, FWS approved the GCP and granted master ITPs to the counties.

64. The master ITPs authorize the counties to issue permits to individuals under their jurisdiction to take Utah prairie dogs without additional permit applications to FWS.

65. This circumvents the ESA's public requirements under Section 10.

66. The GCP provides for the take of Utah prairie dogs to accommodate residential and commercial development within existing Utah prairie dog habitat in the counties.

67. FWS estimates that, under the GCP, there will be a loss of between 1714 (based on historic averages) and 7698 (based on stepped-up estimates) adult prairie dogs over the ten-year period of the GCP. FWS estimates that between 350 acres and 1750 acres of occupied habitat would be lost.

**C. GCP Mitigation and Minimization Measures.**

68. The primary mitigation and minimization measure provided in the GCP is "translocations when feasible." FWS defines feasibility based on the schedule of the project. The GCP would deem translocation feasible if the project can be scheduled within the translocation season, or if the project's schedule is known in advance and translocation can occur in the translocation season prior to the development.

69. FWS estimates that 71% of the Utah prairie dogs taken under the GCP would be translocated. FWS based this number on the highest rate of translocations in the past 21 years under older Utah prairie dog habitat conservation plans for the same area.

70. FWS's translocation estimate is not based on the average translocation rates under previous Utah prairie dog habitat conservation plans for the same area

71. FWS have identified under these previous HCP's that the average of amount of prairie dogs translocated was about 20%.

72. Translocation rates under previous Utah prairie dog habitat conservation plans for the same area have been volatile. There was one year, for example, when only one out of nineteen contractors opted to translocate.

73. Under previous Utah prairie dog habitat conservation plans for the same area, contractors were required to pay a fee if they chose not to translocate. This fee was intended to provide an incentive for developers to translocate prairie dogs.

74. Under the GCP contractors must pay a fee regardless of their willingness to translocate. Therefore, the fee is no longer an incentive for developers to translocate prairie dogs.

75. FWS asserts that translocation will maintain the highest levels of the past 21 years, without the incentive of avoiding the fee.

76. FWS does not provide a reasonable explanation to support its determination that translocation would be higher under the GCP than previous Utah prairie dog habitat conservation plans for the same area. These previous plans placed a high priority on translocation as a mitigation measure and offered financial incentives to translocate.

77. FWS's explanation of the 71% estimated translocations runs counter to the evidence before the agency when it approved the GCP.

78. FWS asserts that 400 to 1200 (1-3 new sites) acres of a translocation sites mitigates the destruction of 350 to 1750 of occupied habit.

79. FWS has not acknowledged that because translocation sites fail about 66% of the time an additional 1200 to 3600 acres of translocation sites would also be required.

80. FWS has not identified the location of these translocation sites.

81. FWS has not identified if the land required for these mitigation measures is available.

82. FWS provides no information, guidance, or requirements about the quality of the habitat of the imagined translocation sites.

83. The identification of mitigation sites is crucial to make an informed decision to issue the GCP and ITPs. Not identifying these sits mot only makes it difficult to assess the impact of future take of Utah prairie dog under the GCP, but also frustrates Friends of Animals and the public's ability to meaningfully comment on the GCP and ITPs.

84. FWS estimates that even if translocations occur at the projected rate, up to 7698 prairie dogs could be taken under the GCP.

85. FWS states that the take will be completely offset by translocations.

86. Minimization and mitigation measures are deemed successful if a translocated colony has a spring count of one for three out of five years.

87. Spring count is multiplied by 7.2 to get an estimated population.

88. FWS indicates that the take of 7698 prairie dogs would be adequately offset by an estimated population of 21.6 prairie dogs.

89. FWS does not reasonably explain how an estimated 7 to 22 prairie dogs adequately mitigates the taking of 1594 to 7698 animals.

90. The GCP and ITPs do not mitigate or minimize the take to the "maximum extent practicable" as required by the ESA.

91. FWS did not consider other mitigation measures that might reduce the impact associated with take of Utah prairie dogs under the GCP and ITPs.

92. The GCP looks at two additional mitigation and minimalization alternatives: (1) Seasonal timing incentive – in which developers would have to pay a fee if they begin construction outside of the translocation season; and (2) no action.

93. The seasonal timing incentive alternative does not offer greater mitigation. As FWS acknowledges, under previous Utah prairie dog habitat conservation plans for the same area, many developers did not take advantage of the incentives.

94. The no action alternative also does not offer any greater mitigation to the take.

95. Friends of Animals requested that FWS consider reasonable alternatives with greater mitigation, such as: (1) seasonal restrictions on development; (2) implementation of practicable measures identified in previous HCPs; (3) protection of crucial habitat, colonies, and connective corridors; and/or (4) having an enforceable limit on the amount of take.

96. These greater mitigation alternatives are reasonable and practicable.

97. FWS did not consider these alternatives in detail.

**D. The GCP May Jeopardize the Future Survival of Utah Prairie Dogs.**

98. In the 2012 revised recovery plan for the Utah Prairie dog, FWS stated that the protection of existing colonies on non-federal land is "crucial to achieve species recovery" and that "protection of these habitats . . . will maintain prairie dog populations and secure connectivity between colonies".

99. The GCP recognizes the importance of protecting medium and large colonies in minor development areas. The GCP finds that these colonies contribute the most toward long-term connectivity and metapopulation viability, and, therefore the "ability to retain at least some of these medium and large colonies is likely important for long-term species conservation."

100. The GCP defines medium colonies as between 20 to 50 prairies dogs and large colonies as more than 50.

101. FWS estimates that between 115 to 1923 prairie dogs will be taken in minor development areas.

102. Therefore, if fully implemented the GCP would result in the loss of between 4.5 and 76.92 medium colonies (using 25 as an average size), or between 1.5 and 25.64 large colonies (using 75 as an average size), in minor development areas.

103. The elimination of medium colonies that "contribute the most to long term connectivity and metapopulation viability," as authorized by the GCP, may jeopardize the likelihood of survivability of the Utah prairie dog in the wild.

104. The elimination of large colonies that "contribute the most to long term connectivity and metapopulation viability," as authorized by the GCP, may jeopardize the likelihood of survivability of the Utah prairie dog in the wild.

105. FWS has not provided a reasonable explanation as to why the elimination of these important colonies will not jeopardizing the likelihood of survival of the Utah prairie dog in the wild.

106. FWS estimates 15,000 prairie dogs will be taken independent of development, in which about 1500 will survive (due to 10% survival rate).

107. Adding the 13,500 prairie dogs that will die to the estimates of take under the GCP of 7152 (estimated take minus the translocation measures), the GCP acknowledges that up to 20,652 prairie dogs could be taken over the course of the GCP, or approximately 25% of the entire population.

108. Killing approximately 25% of the population of a threatened species is a major impact that would appear to jeopardize the likelihood of survival that FWS did not sufficiently analyze to determine the impact on the Utah Prairie Dog.

**E. The GCP and ITPs Do Not Adequately Analyze the Impact of the Allowed Take.**

109. FWS' HCP handbook states that "quantifying the amount of take provides a key basis for evaluating the impact."

110. Previous Utah prairie dog conservation plans provided upper limits of the take allowed and triggering additional costs and fees for the development once the annual limit was met.

111. The GCP has only estimates on how many prairie dogs will be taken under the ITP or how many acres of habitat will be lost under the ITPs.

112. FWS estimated take was based on reported take over four years, 2012-2016.

113. From 2014 to 2017, FWS and the state of Utah did not consider Utah prairie dogs federally protected under the ESA on non-federal land.

114. Under Utah State law, people could take prairie dogs on developed land year-round, without a certificate of registration, or numerical limitation.

115. FWS did not consider whether the changed status of Utah prairie dogs would impact the amount of reported take from 2014 to 2017.

116. The GCP does not provide any additional restrictions if development outpaces the estimation, or the stepped-up estimation.

117. By not quantifying a limit to the take, a boom in growth could outpace the estimates and result in severe impact to the Utah prairie dog, jeopardizing their recovery.

118. Without a limit on the amount of take permitted, FWS cannot reasonably specify the impact of the GCP on the Utah prairie dog.

119. The GCP provides no penalty or consequence for exceeding the estimates, either per year or over the entire life of the GCP.

120. The GCP does provide compliance monitoring, however, because the GCP only identifies estimates and mitigation measures "when feasible," there are no required mitigation and minimization requirements to monitor.

121. FWS has failed to provide a reasonable explanation for eliminating upper limits that would trigger additional fees or mitigation measures.

122. Without any objective criteria to enforce, FWS cannot reasonably determine the impact of the take.

**E. The GCP Does Not Meet the ESA's Adequate Funding Requirement.**

123. FWS estimates that it will cost between $43,501 and $157,434 to cover the cost of mitigation measures.

124. FWS asserts that these there is adequate history of funding to cover these expenses because of previous state funding for the Utah prairie dog and the Endangered Species Management Fund ("ESMF").

125. The ESMF is not dedicated exclusively to funding mitigation and minimalization under the GCP. The fund is also available for other endangered species in Utah, as well as for general conservation efforts.

126. FWS's conclusion that there will be adequate funding is based on the assumptions that: (1) 100% of EMSF will go towards GCP translocations; (2) its calculations of anticipated take and mitigation are accurate; and (3) that there is sufficient space on public or private land to create new prairie dog habitat.

127. FWS has identified that the EMSF has averaged $340,000 a year, most of which going to prairie dog conservation efforts.

128. There is no assurance that the EMSF will be used exclusively for the GCP.

129. FWS arrives at its costs estimates through a number of steps, the first one being to establish the cost per prairie dog to establish two 400-acre translocation sites for 1500 prairie dogs.

130. FWS asserts that it costs $408,596 to establish two translocation sites, divides that by 1500 to establish a $272 per prairie dog baseline.

131. Unexplainably, FWS then uses that number to develop an average prairie dog per acre, and estimates the cost based on how many acres of occupied habitat is being taken.

132. This cost breakdown is problematic.

133. FWS asserts that it will establish 3 to 9 new translocation sites at 400 acres each.

134. Taking the starting number of establishing a 400-acre translocation site, $204,298 ($408,596 ÷ 2), the cost for establishing 3 to 9 new sites is between $612,894 and $1,838,682.

135. FWS grossly underestimates the cost of the program, basing its analysis on how many prairie dogs per acre it anticipates will be translocated, rather than the more reasonable estimation of how much it costs to establish the sites they are moving the prairie dogs to.

136. The GCP per/prairie dog cost estimate is based on the assumption that 1500 prairie dogs will be translocated every year.

137. The choice of beginning the cost breakdown with 1500 prairie dogs is also not supported by the record and only functions to lower the cost per prairie dog in the analysis.

138. The GCP does not anticipate that 1500 prairie dogs will be translocated each year under the GCP.

139. Under the GCP (not including translocations independent of development), FWS estimates that an average of 547 prairie dogs will be translocated each year.

140. The cost per translocation site is increased dramatically if the per prairie dog starting point is based on the actual estimated amounts of translocation.

141. FWS also uses different data sets to calculate the impact of mitigation and minimization measures and the cost to fund such mitigation and minimization measures.

142. In calculating the impact of minimization measures, FWS considers translocation of prairie dogs from minor and major development areas.

143. In calculating the cost of minimization measures, FWS did not consider the costs of translocating Utah prairie dogs from minor development areas.

144. FWS has failed to assure funding for the costs and used numbers in their analysis to give the appearance of a lesser cost than what could be the cost.

145. In calculating the impact of mitigation measures, FWS considered the creation of new prairie dog habitat to mitigate the estimated amount of prairie dog habitat taken from major and minor developmental areas.

146. In calculating the cost of mitigation measures, FWS failed to consider the costs of creating additional habitat to offset habitat taken from major developmental areas.

**F. FWS Relies Upon Inconsistent Calculations in The GCP.**

147. FWS's estimate of take was based on a five-year average of habitat taken from 2012 to 2016 along with density based on spring counts from 2010 to 2014 in the various recovery units and development areas.

148. FWS's estimate of the impact of mitigation is based on three out of the last twenty years where Iron County had the highest level of translocations.

149. FWS's estimate of the cost of minimization measures necessary to assure adequate funding purposes is not tied to any specific data, rather it is a "reasonable estimate" that was reached to "balance recovery and community needs."

150. When measuring translocation for funding purposes based on a per prairie dog cost, FWS estimates that less prairie dogs will be translocated then were translocated in the previous two years.

151. FWS does not explain why it used inconsistent data sources to analyze the impacts of take, the impact of mitigation, and the costs of the GCP.

**F. NEPA Compliance.**

152. On December 19, 2017, FWS published a draft EA on the impact of issuing the master ITPs to the counties.

153. On January 18, 2018, Friends of Animals submitted comments requesting FWS prepare an EIS.

154. On April 10, 2018, FWS published the final EA and a finding of no significant impact.

155. Neither the EA nor the GCP identify what colonies will be taken under the GCP.

156. Connectivity of colonies is vital to maintaining the population in the wild.

157. Without identifying which colonies will be impacted by the ITPs, FWS cannot evaluate the impact to the connectivity of the colonies.

158. The GCP covers the entire range of Utah prairie dogs.

159. FWS has acknowledged that Utah prairie dogs are a keystone species providing benefits to many other species and the ecosystem.

160. The EA mentions the importance of the Utah prairie dog to the ecosystem

161. The EA does not sufficiently analyze how allowing for incidental take of prairie dogs and their habitat across 61,037 acres would affect the multiple other animal and plant species that rely on the Utah prairie dog for burrows, food, decreased vegetation height, and to aerate the soil.

162. The EA does not identify which occupied habitats will be lost to development under the GCP. The EA acknowledges that it was not known how much of the estimated take would be additive and/or compensatory because many prairie dogs do not survive their first year.

163. This assertion requires further analysis to determine if the estimated take is compensating for the natural death of the prairie dogs or adding to it, which highlights additional uncertainty and/or controversy over the impact of the GCP and its mitigation measures.

164. FWS did not take a "hard look" at the environmental impacts of its actions.

165. First, FWS did not include a detailed analysis of how non-target species would be impacted by the GCP and the vast amount of habitat destruction that could be authorized.

166. Second, FWS did not take a hard look at the impact of the GCP on the Utah prairie dogs, the available habitat that would remain, and whether there would be adequate connective corridors.

167. Finally, FWS failed to take a hard look at reasonable alternatives including alternatives that would: (1) place a seasonal restriction on take to prevent takings during the breeding and young-rearing season; (2) implement practicable measures identified in previous HCPs; (3) place limits on the areas and amounts of prairie dogs that could be taken; and (4) preserve high-quality habitat, important colonies, and connective corridors.

**FIRST CLAIM FOR RELIEF**

168. Plaintiff alleges and incorporates by reference all the preceding paragraphs.

169. FWS's April 2018 decision is arbitrary, capricious and inconsistent with the ESA for the following reasons: (1) FWS failed to require the GCP to minimize and mitigated the impact Utah prairie dog to the maximum extent practicable; (2) FWS failed to adequately identify the impact of the take; (3) FWS failed to require that the counties assured adequate funding for the GCP; (4) FWS failed to demonstrate that the taking would not reduce the likelihood of the survival and recovery of Utah prairie dog in the wild; and (5) FWS, without explanation, deviated from its own guidance documents.

170. FWS' April 2018 decision, and its issuance of the GCP and ITPs, should be vacated and remanded pursuant to the APA, 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**

171. Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

172. NEPA and its implementing regulations require federal agencies to prepare an EIS for every major federal action significantly affecting the environment. 42 U.S.C. § 4332(C).

173. The April 2018 decision to issue the GCP and ITPs to the counties is a major federal action.

174. The April 2018 decision will have more than a minor or negligible effect on a species listed under ESA—the Utah prairie dog—and other species that dependent on the prairie dog and its habitat.

175. There is significant controversy with the issuance of a master ITP to the counties that require preparation of an EIS, including highly controversial environmental effects, unresolved conflicts, highly uncertain and potentially significant environmental risks, precedents for future actions, direct relationships with other actions that have cumulatively significant risks, and significant impacts on other species.

176. FWS violated NEPA by issuing the GCP and ITPs without first conducting the necessary environmental analysis of the impacts of such permit in an EIS. FWS' April 2018 decision, and its issuance of the GCP and ITPs, should be vacated and remanded pursuant to the APA, 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**

177. Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

178. NEPA requires consideration of reasonable alternatives to a final agency action.

179. In making the April 2018 decision to issue the GCP and ITPs, failed to adequately consider reasonable alternatives.

180. FWS failed to consider reasonable alternatives including alternatives that would: (1) place a seasonal restriction on take to prevent takings during the breeding and young-rearing season; (2) implement practicable measures identified in previous HCPs; (3) place limits on the areas and amounts of prairie dogs that could be taken; and (4) preserve high-quality habitat, important colonies, and connective corridors.

181. FWS violated NEPA, by failing to consider reasonable alternatives before issuing the GCP and ITPs. FWS' April 2018 decision, and its issuance of the GCP and ITPs, should be vacated and remanded pursuant to the APA, 5 U.S.C. § 706(2).

**FOURTH CLAIM FOR RELIEF**

182. Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

183. NEPA requires an agency to take a "hard look" at the impact of the agency action on the human environment.

184. FWS failed to include a detailed analysis of how non-target species would be impacted by the GCP and the vast amount of habitat destruction that could be authorized.

185. FWS failed to take a hard look at the impact of the GCP on the Utah prairie dogs, the available habitat that would remain, and whether there would be adequate connective corridors.

186. FWS violated NEPA, by failing to take a hard look at the environmental impacts associated with the GCP and ITPs. FWS' April 2018 decision, and its issuance of the GCP and ITPs, should be vacated and remanded pursuant to the APA, 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

1. Declare that in approving the GCP and issuing master Incidental Take Permits to Iron, Beaver, and Garfield Counties, Defendant acted arbitrary, capricious and inconsistent with the ESA;
2. Declare that in approving the GCP and issuing master Incidental Take Permits to Iron, Beaver, and Garfield Counties, Defendant acted arbitrary, capricious and inconsistent with NEPA;
3. Enjoin any action authorized by the GCP and Incidental Take Permits at issue in this case until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;
4. Vacate and remand back to FWS the GCP and Incidental Take Permits issued to Iron, Beaver, and Garfield Counties;
5. Order FWS to carry out and/or require remedial relief for any harm to species already caused by the issuance of ITPs and implementation of the GCP;

6. Award Plaintiff reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and/or all other applicable authorities; and/or
7. Grant such further relief as the Court deems just and equitable.

Respectfully submitted on August 22 2018.

/s Joel Ban
JOEL BAN, Utah Bar No. 10114
Ban Law Office PC
Post Office Box 118
Salt Lake City, Utah 84110Telephone:
801-532-2447