JOEL BAN, joel.ban@gmail.com, Utah Bar No. 10114
Attorney for Plaintiff, Friends of Animals
Ban Law Office PC Post Office Box 118
Salt Lake City, Utah 84110
Telephone: (801) 532-2447

JENNIFER BEST, jennifer@friendsofanimals.org, *pro hac vice*
Attorney for Plaintiff, Friends of Animals
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Telephone: (720) 949-7791

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FRIENDS OF ANIMALS,<br><br>               Plaintiff,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>               Defendant. | Case No. 4:18-cv-00053-DN-PK<br><br><br>**PLAINTIFF'S OPENING BRIEF**<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

ISSUES PRESENTED ..................................................................................................... 2

STATEMENT OF THE CASE .......................................................................................... 3

  A.  Background ............................................................................................................ 3

  B.  The GCP and ITPs ................................................................................................ 5

STANDARD OF REVIEW ............................................................................................... 9

SUMMARY OF THE ARGUMENT ................................................................................ 10

ARGUMENT .................................................................................................................. 12

  A.  The GCP will not fully offset the impacts of the take of Utah prairie dogs and
     their habitat and will not minimize and mitigate to the maximum extent
     practicable. ........................................................................................................... 12

    1.  FWS had no basis to determine that the mitigation and minimization
       measures will fully offset the impacts of the take. ......................................... 15

    2.  The mitigation and minimization measures will not fully offset the impacts of
       the take. ......................................................................................................... 19

    3.  The GCP's measure for success does not fully offset the impacts of the take. ............ 22

    4.  The GCP's minimization measure of translocation when feasible without any
       incentive is unenforceable and will neither fully offset nor minimize the
       impacts of the take to the maximum extent practicable. ................................ 24

    5.  The GCP will not mitigate or minimize the impacts to the maximum extent
       practicable because it abandons feasible measures from current and past
       HCPs and does not implement additional practicable measures. .................. 26

  B.  FWS's failure to consider GCP alternatives that avoid or reduce take violates
     the ESA and APA. ................................................................................................. 27

  C.  FWS failed to demonstrate that the taking is not likely to reduce the likelihood
     of the survival and recovery of Utah prairie dogs in the wild. ............................ 29

  D.  FWS failed to ensure there was adequate funding for the GCP. .......................... 37

    1.  FWS failed to ensure adequate funding to mitigate habitat loss in major
       development areas and erroneously assumed there is sufficient space, free of
       charge, on public or private land to implement mitigation and minimization
       measures. ...................................................................................................... 38

    2.  FWS failed to ensure adequate funding to mitigate habitat loss in minor
       development areas. ........................................................................................ 40

E.   In issuing the GCP, FWS failed to comply with NEPA....................................................... 42

CONCLUSION.............................................................................................................................. 46

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ....................................... 47

# TABLE OF AUTHORITIES

**Cases**

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council*
  462 U.S. 87 (1983) ............................................................................... 40

*Camp v. Pitts,*
  411 U.S. 138 (1973) ............................................................................... 9

*Citizens' Comm. to Save Our Canyons v. Krueger,*
  513 F.3d 1169 (10th Cir. 2008) ......................................................... 8, 9

*Found. on Econ. Trends v. Heckler,*
  756 F.2d 143 (D.C. Cir. 1985) .............................................................. 41

*Gerber v. Norton,*
  294 F.3d 173 (D.C. Cir. 2002) .............................................................. 17

*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977) .............................................................................. 12

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.,*
  99 F. Supp. 3d 1033 (N.D. Cal. 2015) ............................................ 22, 23

*Lewis v. Babbitt,*
  998 F.2d 880 (10th Cir. 1993) ................................................................ 8

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1972) .............................................................................. 12

*Middle Rio Grande Conservancy Dist. v. XXXXX,*
  206 F. Supp. 2d 1168 (D.N.M. 2000) .............................................. 32, 33

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................. 9,17,19, 21

*Nat'l Wildlife Fed'n v. Babbitt,*
  128 F. Supp. 2d 1274 (E.D. Cal. 2000) ................................................ 40

*Nat'l Wildlife Fed'n v. Norton,*
  No. CIV-S-04-0579 DFL JFM, U.S. Dist LEXIS 33768
  (E.D. Cal., September 7, 2005) ....................................................... 13, 20

*New Mexico. ex rel. Richardson v. BLM,*
  565 F.3d 683 (10th Cir. 2009) .............................................................. 27

*Oregon Nat. Res. Council v. Marsh,*
  832 F.2d 1489 (9th Cir. 1987) .............................................................. 44

*Renewable Fuels Ass'n v. United States EPA,*
  948 F.3d 1206 (10th Cir. 2020) ............................................................ 15

*Sierra Club v. Marsh,*
  816 F.2d 1376 (9th Cir. 1987) ................................................................ 17

*Sierra Club v. Norton,*
  207 F. Supp. 2d 1310 (S.D. Ala. 2002) .................................................... 45

*Silverton Snowmobile Club v. United States Forest Serv.,*
  433 F.3d 772 (10th Cir. 2006) ................................................................ 42

*Sw. Ctr. for Biological Diversity v. Babbitt,*
  215 F. 3d 58 (D.C. Cir. 2000) .......................................................... 29, 40

*Sw. Ctr. for Biological Diversity v. Bartel*
  470 F. 2d 1118 (S.D. Cal. 2006) .................................................. 20, 23, 35

*Town of Barnstable v. FAA*
  659 F. 3d 28 (D.C. Cir. 2011) ................................................................ 15

*Tucson Herpetological Society v. Salazar,*
  566 F. 3d 870 (9th Cir. 2009) ................................................................ 29

*Vermont Yankee v. Natural Res. Def. Council,*
  435 U.S. 519 (1978) ............................................................................... 42

*Weinberger v. Catholic Action of Hawaii/Peace Education Proj.,*
  454 U.S. 139 (1981) ............................................................................... 42

**Statutes**

5 U.S.C. § 706 .................................................................................... 9, 29

16 U.S.C. § 1532 ...................................................................................... 13

16 U.S.C. § 1536 ............................................................................ 11, 29, 30

16 U.S.C. § 1539 ............................................. 11, 13, 19, 24, 27, 29, 37

42 U.S.C. § 4321 ...................................................................................... 42

42 U.S.C. § 4332 ................................................................................. 42, 43

**Regulations**

40 C.F.R. § 1502.16 ............................................................................ 43, 46

40 C.F.R. § 1508.9 ................................................................................... 43

40 C.F.R. § 1508.27 ............................................................................ 41, 42

50 C.F.R. § 17.3 ......................................................................................... 5

50 C.F.R. § 402.02 ........................................................................................................... 29

50 C.F.R. § 402.14 ................................................................................................... 29, 43

**Federal Register**

Final Rule to Reclassify the Utah Prairie Dog as Threatened,

    49 Fed. Reg. 22330 (May 29, 1984) ........................................................................ 4

 Revised Recovery Plan for the Utah Prairie Dog,

    77 Fed. Reg. 24975 (April 26, 2012) ...................................................................... 4

Draft Range-Wide General Conservation Plan for Utah Prairie Dogs and Environmental
    Assessment,

    82 Fed. Reg. 60211 (Dec. 19, 2017) ....................................................................... 5

# INTRODUCTION

It is scientifically indisputable that the Utah prairie dog is a keystone species—animals considered critical to maintaining Utah's native meadow ecosystem. Even so, their regulatory history is one of conflict between the species' protection and the economic interests of Iron, Beaver, and Garfield Counties. Starting in the 1920s, Utah prairie dogs were subject to indiscriminate killing by those seeking their habitat for human use. Although listed under the Endangered Species Act (ESA) in 1973, local officials in these Counties have continuously sought—quite successfully—fewer restrictions on the allowable take of prairie dogs. In fact, even before the April 2018 issuance of the Range-Wide General Conservation Plan (GCP) by the United States Fish and Wildlife Service (FWS) at issue here, federal regulations granted unrestricted take for purposes of protecting agriculture, to prevent serious human safety hazards, or to protect the sanctity of human cultural or burial sites. Dissatisfied with these federal concessions, the Counties sued in 2016 to invalidate all regulation of Utah prairie dogs on non-federal lands. Although that challenge failed, the result was the GCP at issue here, which is by far the most indulgent set of rules issued by the federal government pertaining to Utah prairie dogs.

The GCP provides broad authority to the Counties to authorize take of Utah prairie dogs for over ten years. The GCP, for the first time, does not limit take to specific sites or even identify where take will occur. Moreover, the main minimization and mitigation measure identified in the GCP is translocating prairie dogs when feasible. Not only is this measure not mandatory and not adequately funded by the GCP, but it is also ineffective at conserving prairie dogs. Ninety percent of prairie dogs will not survive past the first year after they have been

1

translocated. Moreover, two-thirds of all translocation sites fail completely. Overall, the GCP significantly reduces the likelihood of survival and recovery of the Utah prairie dog in the wild.

In approving the GCP, FWS made many decisions that were arbitrary and capricious under the ESA and the National Environmental Policy Act (NEPA). Thus, this Court should vacate and remand the GCP and related incidental take permits (ITPs) pursuant to the Administrative Procedure Act (APA).

## ISSUES PRESENTED

1.   Whether FWS's decision that the mitigation and minimization measures will fully offset the impacts of the take is arbitrary and capricious when FWS did not identify the quality and location of the habitat being taken or replaced, the mitigation ratio does not consider the low success rate of translocations, the measure of minimization success is extremely low, and the mitigation and minimization measures are unenforceable.

2.   Whether FWS's failure to consider whether the GCP will mitigate and minimize the impacts of the take to the maximum extent practicable requires vacatur of the GCP and ITPs when the GCP's minimization and mitigation measures do not fully offset the impact of the take.

3.   Whether the GCP will mitigate and minimize the impacts of the take to the maximum extent practicable when the mitigation and minimization measures are unenforceable and the GCP does not include more protective measure from past Habitat Conservation Plans (HCPs).

4.   Whether FWS's approval of the GCP was arbitrary and capricious when the GCP alternatives do not avoid or reduce the take.

5.   Whether FWS's decisions that the taking will not appreciably reduce, and is not likely to jeopardize, the likelihood of the survival and recovery of Utah prairie dogs in the wild is

2

arbitrary and capricious when it relied on inconsistent data and failed to consider key factors necessary for the species' survival and recovery, such as connective habitat and the importance of existing colonies on non-federal land.

6.   Whether FWS's decision that there was adequate funding for the GCP was arbitrary and capricious when the Counties have not committed to provide funding, and the estimated funding calculation is flawed.

7.   Whether FWS violated the NEPA by failing to take a hard look at the impact of the GCP and ITPs, failing to prepare an environmental impacts statement, and ignoring reasonable alternatives.

## STATEMENT OF THE CASE

### A.  Background

The Utah prairie dog is a unique, highly social, keystone species that lives on grassland habitat. The Utah prairie dog's historic range spread across eight counties in Utah and in the 1920s, their population neared 100,000.[1] Due to invasion of the sylvatic plague, loss of habitat to livestock, and a deliberate poisoning campaign, the Utah prairie dog population declined drastically to about 3,300 by 1972.[2] In 1973, biologists predicted the Utah prairie dog would become extinct by the year 2000.[3] This overwhelming population decline led FWS to list the Utah prairie dog as an endangered species under the ESA in 1973.[4] In 1984, a petition by the Utah Division of Wildlife Resources to completely delist the Utah prairie dog caused FWS to

---

[1] FWS_LIT_005634.
[2] FWS_LIT_005634; FWS_LIT_009080.
[3] FWS_LIT_009080.
[4] FWS_LIT_009541.

downgrade the prairie dog's status from endangered to threatened and create a special rule under section 4(d) of the ESA to permit the take of up to 5,000 Utah prairie dogs per year on non-federal lands.[5]

In 1991, FWS revised the special 4(d) rule to allow take of up to 6,000 animals per year on non-federal lands throughout the species' entire range and established a recovery plan to increase the Utah prairie dog population.[6] In 1998, FWS approved a Utah prairie dog HCP for Iron County.[7] In 2012, FWS revised the special rule again to allow take, without a permit, where Utah prairie dogs cause serious human safety hazards or disturb the sanctity of human cultural or burial sites.[8] Such takes do not count toward the 6,000 annual take limit previously authorized.

Today, the Utah prairie dog has been extirpated from 90% of its historical range and its current range is limited to three recovery units in the southwestern quarter of Utah.[9] By 2016, there was a spring count of only 11,484 total prairie dogs.[10] Of these, over 70% reside on non-federal lands where they are vulnerable to threats associated with habitat loss from commercial and residential development.[11] The three recovery units are: (1) the West Desert Recovery Unit, which is predominantly within Iron County, with the northern portion extending into Beaver County; (2) the Paunsaugunt Recovery Unit, which is mostly in Garfield County; and (3) the Awapa Plateau Recovery Unit, a portion of which is within Garfield County.[12]

---

[5] Final Rule to Reclassify the Utah Prairie Dog, 49 Fed. Reg. 22330 (May 29, 1984).
[6] FWS_LIT_009548; *see generally* FWS_LIT_009068-235.
[7] *See generally* FWS_LIT_006148-258.
[8] Revised Recovery Plan for the Utah Prairie Dog, 77 Fed. Reg. 24975 (April 26, 2012).
[9] FWS_LIT_005634.
[10] FWS_002121; FWS_007905.
[11] FWS_LIT_009559.
[12] FWS_LIT_009554.

### B.  The GCP and ITPs

An incidental take permit (ITP) is a permit issued under section 10(a)(1)(B) of the ESA to a non-federal party undertaking an otherwise lawful project that might result in the take of an endangered or threatened species.[13] Application for an ITP is subject to certain requirements, including preparation by the permit applicant of a conservation plan, generally known as an HCP.[14] "Congress intended the HCP program to address listed and at-risk species in an ecosystem context, generate long-term commitments to conserve such species, and deliver regulatory assurances to project proponents."[15] A GCP is a type of HCP that is completed at a landscape level where the FWS defines the scope, the conservation plan, and associated mitigation requirements.[16]  Individuals can receive an ITP after they demonstrate compliance with the conservation plan and mitigation requirements.[17]

On December 19, 2017, FWS published a draft GCP for the Utah prairie dog.[18] On January 18, 2018, Friends of Animals submitted comments on the draft GCP discussing its flaws and requesting that FWS both prepare an environmental impact statement (EIS) and consider additional alternatives under the ESA and NEPA.[19] Despite these concerns, on April 3, 2018, FWS approved the GCP and granted master ITPs to the Counties on April 10, 2018.[20]

---

[13] FWS_LIT_010278.
[14] 50 C.F.R. § 17.3.
[15] FWS_LIT_009905.
[16] FWS_LIT_010274-75.
[17] *Id.*
[18] Draft Range-Wide General Conservation Plan for Utah Prairie Dogs and Environmental Assessment, 82 Fed. Reg. 60211 (Dec. 19, 2017).
[19] *See generally* FWS_001227-38.
[20] FWS_002093; FWS_001930 (Beaver); FWS_002079 (Garfield); FWS_002086 (Iron).

The master ITPs authorize Iron, Beaver, Wayne, and Garfield Counties (collectively "Applicants" or "Counties") to issue permits to individuals under their jurisdiction to take Utah prairie dogs without additional permit applications to FWS.[21] The GCP allows the take of Utah prairie dogs to accommodate residential and commercial development within existing Utah prairie dog habitat in the Counties.[22] FWS estimates that the GCP will result in the take of 7,152 Utah prairie dogs and 1,750 acres of occupied prairie dog habitat.[23] The GCP also contemplates that there will be additional "translocations independent of development," meaning that construction activities do not need to be proposed or occurring on a property for prairie dogs to be translocated.[24] However, take association with translocations independent of development would not be covered by the ITPs.[25]

The GCP divides occupied habitat into two zones: (1) major development areas, which it defines as "lands that are already either built out or adjacent to built-out areas;" and (2) minor development areas, which it defines as "lands that are less likely than the major development areas to have large-scale human development growth over the term of this GCP."[26] The primary mitigation strategy for the major development areas "is the establishment and maintenance of new colonies or reestablishment of existing colonies on Federal or other protected lands (using translocated prairie dogs from developing sites)."[27] The primary mitigation strategy for the minor development areas "is the protection of some colonies through land acquisitions, conservation

---

[21] FWS_002110.
[22] FWS_002109.
[23] FWS_002161; FWS_002070 (citing GCP *Table 12*); FWS_001685.
[24] FWS_002138.
[25] FWS_001674.
[26] FWS_002113-14.
[27] FWS_002067.

easements, or conservation banks."[28] Conservation banks are lands that are conserved and

permanently managed for species that are endangered or threatened, and function to offset

adverse impacts to these species that occurred elsewhere.[29] The mitigation ratio refers to the

number of acres that FWS claims will be conserved in exchange for habitat that will be taken by

development. The GCP uses a mitigation ratio of "greater than 1:1" and does not establish a set

mitigation ratio other than the alleged "minimum threshold" of "at least 2:1."[30] The GCP does

not include any requirements or information about the quality or location of the land being taken

or replaced.

The primary minimization measure is translocations of Utah prairie dogs away from

developing properties "when feasible."[31] FWS determines feasibility of translocations based on

the "project proponent's development schedule" and only deems translocation feasible if the

project can be scheduled within the translocation season, or if the project's schedule is known in

advance and translocation can occur in the translocation season prior to the development.[32]

Translocations have a low survival and success rate. Less than ten percent of prairie dogs survive

after the first year of translocation, and two-thirds of all new translocation sites fail.[33] Despite

these flaws, FWS considers the translocation plan successful even if all prairie dogs on two-

thirds of the translocation sites die, and the remaining one-third of the sites have a spring count

of one prairie dog (which equates to 7.2 prairie dogs) for three out of five years (not necessarily

---

[28] FWS_002067.
[29] FWS_002094.
[30] FWS_002135.
[31] FWS_001938; FWS_002126.
[32] FWS_002095.
[33] FWS_LIT_009591; FWS_002132.

consecutive).[34] Further, the GCP does not contain more protective mitigation and minimization measures that have been implemented in past HCPs.

FWS contends that the GCP fully offsets the impacts because "1) acres of lost habitat in the permit area will be replaced on Federal or protected lands at a 1:1 ratio or 2) offset through the use of conservation banks, land acquisitions, or conservation easements at a greater than 1:1 ratio."[35] The GCP claims that the impacts of the taking will be "fully offset with the establishment of new colonies through translocations and restoration, protection, and management of appropriate habitat."[36]

The GCP only considered two additional mitigation and minimization alternatives: (1) seasonal timing incentive – in which developers would have to pay a fee if they begin construction outside of the translocation season; and (2) no action.[37] The no action alternative is standard and the seasonal timing incentive alternative does not avoid or reduce the take.

The GCP and ITPs violate the ESA and NEPA for many reasons, including: (1) the GCP fails to fully offset the impacts of the take and fails to mitigate and minimize to the maximum extent practicable; (2) the GCP fails to consider alternatives to the take; (3) FWS failed to consider the best available information in determining whether the GCP is likely to adversely impact or jeopardize  the survival and recovery of the Utah prairie dogs; (4) FWS failed to ensure there was adequate funding for the GCP; and (5) FWS failed to take a hard look at the environmental impacts of the GCP.

---

[34] FWS_002140.
[35] FWS_001943 (citing GCP section 9.5, *Mitigation Results*).
[36] FWS_002167 (citing GCP section 9.5, *Mitigation Results*).
[37] FWS_002177-79.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) "governs judicial review of agency actions."[38] The APA directs a reviewing court to hold unlawful and set aside any actions, findings, and conclusions by a federal agency that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[39] Review of an agency's decision is generally confined to "the administrative record that was before the agency at the time of its decision."[40]

An agency's action is arbitrary or capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[41] "[T]he reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment."[42] At the very least, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[43] If an agency's finding "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [it] for further consideration."[44]

---

[38] *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).
[39] 5 U.S.C. § 706(2)(A).
[40] *Lewis v. Babbitt*, 998 F.2d 880, 882 (10th Cir. 1993).
[41] *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[42] *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1176 (quotation omitted).
[43] *State Farm*, 463 U.S. at 43 (quotation omitted).
[44] *Camp v. Pitts*, 411 U.S. 138, 143 (1973).

## SUMMARY OF THE ARGUMENT

FWS had no basis to conclude that the GCP's mitigation and minimization measures will fully offset the impact of the taking of 7,152 prairie dogs and 1,750 acres of Utah prairie dog habitat. To fully offset the take, the required mitigation must at least be equal to the impacts of the taking. The GCP fails to identify the location or quality of the habitat to be taken or replaced. The GCP merely uses an ambiguous mitigation ratio of "greater than 1:1" or "minimum threshold" of "at least 2:1." Moreover, FWS has not determined that sufficient federal land is available and whether it will be suitable, since Utah prairie dogs do not survive as well on arid federal land.

In addition, the GCP mitigation and minimization measures will not fully offset the impacts of the taking. The GCP's minimum threshold of "at least 2:1" is insufficient because FWS failed to consider the low success rate of translocations, with two-thirds of all new translocation sites failing. Moreover, the GCP's measure of success, which considers the translocation plan successful even if all prairie dogs on two-thirds of the translocation sites die, and the remaining one-third of the sites have a spring count of one prairie dog for three out of five years, does not fully offset the loss of 7,152 prairie dogs. Further, the GCP's minimization measure of "translocation when feasible" cannot fully offset the impacts of the taking because it is unenforceable and allows developers to unilaterally avoid translocating prairie dogs.

Because FWS determined that the impacts of the take will be fully offset, FWS refused to consider whether the GCP will mitigate or minimize the impacts of the take to the maximum extent practicable. Since FWS's fully offset determination is arbitrary and capricious, this Court should vacate and remand the GCP and ITPs. Even so, the GCP will not mitigate or minimize to

the maximum extent practicable because the measures are unenforceable, fail to include practicable measures from past HCPs, and FWS failed to explain why other more protective measures are not practicable. In addition, FWS's approval of the GCP was arbitrary and capricious because the GCP failed to consider any alternatives that would avoid or reduce the take.

FWS also erred in determining that the GCP "will not appreciably reduce the likelihood of the survival and recovery of the species"[45] and failed to ensure that issuing the ITPs is not likely to "jeopardize the continued existence"[46] of Utah prairie dogs. The largely unrestricted take, and inadequate minimization and mitigation measures will severely impede the survival and recovery of Utah prairie dogs. The Utah Prairie Dog Recovery Plan found that urban expansion was one of the greatest threats to Utah prairie dogs, and that protecting existing colonies and ensuring connectivity between colonies was necessary for their recovery. However, FWS's finding fails to consider how the GCP will impact the recovery goals and objections and fails to contain measures to adequately protect Utah prairie dogs. To the contrary, the permit area covers all non-federal habitat and fails to place any meaningful limits on what habitat can be destroyed. Without additional restrictions, FWS cannot make a finding that the GCP will not appreciably reduce the likelihood of the survival and recovery of the Utah prairie dog in the wild. Moreover, FWS did not rely on the best available data in making its findings under the ESA, and its findings run counter to the evidence in the record.

---

[45] 16 U.S.C. § 1539(a)(2)(B)(iv).
[46] 16 U.S.C. § 1536(a)(2).

FWS's finding that there was adequate funding for the implementation of the GCP was similarly flawed. Not only did the Applicants fail to commit to any funding, but the historical funding indicates that there is not sufficient money to carry out all the conservation actions that the GCP claims will occur over the ten-year term of the GCP.

The decision is also inconsistent with NEPA, which requires FWS to carefully consider a wide range of alternatives to the proposed GCP. Here, FWS considered only alternatives that were similar to the proposal or assumed that they would be granting permits to individuals regardless of whether the GCP was approved. FWS did not consider a greater mitigation alternative, such as restrictions on development, protection of specific crucial colonies and connective corridors, or even a take limit.

**ARGUMENT**[47]

### A. The GCP will not fully offset the impacts of the take of Utah prairie dogs and their habitat and will not minimize and mitigate to the maximum extent practicable.

The ESA prohibits the "take" of any endangered or threatened species, such as the Utah prairie dog.[48] The ESA defines take broadly as "to harass, harm, pursue, hunt, shoot, wound, kill,

---

[47] Friends of Animals' standing has not been challenged in this case. Nonetheless, it is plaintiff's burden to establish that: (1) they have suffered an "injury in fact;" (2) the injury is fairly traceable to the challenged action of the defendants; and (3) it is likely that a favorable judicial decision will prevent or redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1972). An organization can assert "representational standing" to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Declaration from Friends of Animals member and staff demonstrates that the challenged GCP and ITPs will cause them injury and a favorable judicial decision will likely redress this injury and prevent further injury. *See* Decl. of Michael Harris. Friends of Animals can fully brief this issue if the Court or Defendants dispute such standing.

[48] 16 U.S.C. § 1538(a)(1).

trap, capture, or collect, or attempt to engage in any such conduct."[49] Harm in the definition of take may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."[50] Section 10 of the ESA provides a narrow exception to the ESA's take prohibition and allows FWS to issue an ITP authorizing limited take that incidentally results from otherwise lawful activity.[51]

The ESA requires applicants wishing to obtain an ITP to submit an HCP that specifies "what steps the applicant will take to minimize and mitigate such impacts."[52] After considering the permit application and the related conservation plan, FWS can only issue an ITP if it finds that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking."[53]

An applicant can meet the statutory requirement of minimizing and mitigating the impacts of the take "to the maximum extent practicable" in two ways. First, the maximum extent practicable requirement "will always be met if the HCP applicant demonstrates that the impacts of the taking will be fully offset by the measures incorporated into the plan."[54] FWS defines the term "fully offset" as:

> [C]ompletely mitigating any impacts expected to remain after avoidance and minimization measures are implemented. In other words, fully offset means the biological value that will be lost from covered activities will be fully replaced through implementation of conservation measures with equivalent biological value.

---

[49] 16 U.S.C. § 1532(19).
[50] 50 C.F.R. § 17.3.
[51] 16 U.S.C. 1539(a)(1)(B).
[52] 16 U.S.C. 1539(a)(2)(A)(ii).
[53] *Id.* § 1539(a)(2)(B)(ii).
[54] FWS_LIT_010066.

Fully offset also means the mitigation is commensurate (equal) with the impacts of taking.[55]

Second, if the HCP will not fully offset the impacts of the taking, the applicant can meet the maximum extent practicable requirement by demonstrating that "the minimization and mitigation measures provided in the plan represent the most the applicant can practicably accomplish."[56] "Maximum extent practicable means, within their available means, the applicant can feasibly do no more to minimize or mitigate the impacts of the taking."[57] This finding has two components, "(1) the adequacy of the mitigation program in proportion to the level of injury -- take -- that will result; and (2) whether the mitigation is the maximum that can be practically implemented by the applicant."[58]

Here, FWS arbitrarily concluded that the "minimization and mitigation measures are biologically sufficient to fully offset the impacts of the incidental take of Utah prairie dogs under the GCP and will support recovery of the species."[59] FWS's decision that the minimization and mitigation measures will fully offset the impacts of the take is arbitrary and capricious because (1) FWS had no basis to make this determination; and (2) the measures will not fully offset the impacts of the take. Since FWS determined that the measures will "fully offset" the impacts of the take, FWS refused to consider whether the measures will minimize and mitigate to the maximum extent practicable, and this Court should vacate and remand on this flaw alone.[60] In

---

[55] FWS_LIT_010066.

[56] *Id.*

[57] FWS_LIT_010071.

[58] *Nat'l Wildlife Fed'n v. Norton*, No. CIV-S-04-0579 DFL JFM, 2005 U.S. Dist. LEXIS 33768, at *46 (E.D. Cal., September 7, 2005).

[59] FWS_001943.

[60] FWS_002069.

any case, the measures will not minimize and mitigate the impacts to the maximum extent practicable because they are unenforceable and FWS failed to include more protective practicable measures from past HCPs.[61] Thus, FWS's decision to approve the GCP and ITPs is arbitrary and capricious, and this Court should vacate and remand the GCP and ITPs.

1. **FWS had no basis to determine that the mitigation and minimization measures will fully offset the impacts of the take.**

The GCP relies on a mitigation ratio which refers to the number of acres that FWS claims will be conserved in exchange for habitat that will be taken by development. The GCP's primary measures to conserve habitat include conservation banks in minor development areas and translocations in major development areas.[62] The GCP uses an ambiguous mitigation ratio of "greater than 1:1" and only establishes an alleged "minimum threshold" of "at least 2:1."[63] FWS had no basis to determine that this mitigation ratio will fully offset the impacts of the take.

To fully offset the impacts of habitat loss, if for example, "100 acres of habitat type x are permanently lost," the measure must "restore and protect in perpetuity (at least) 100 acres of habitat type x that is of (at least) equal biological value to the covered species before impacts occur."[64] Thus, even if a plan calls for the conservation of equal acres or slightly more acres of land, that does not mean the take will be fully offset because the habitat must be of at least equal biological value. In one example, FWS explained that the project proponent for the golden-cheeked warbler could purchase credits from a conservation bank at a mitigation ratio of 3:1 for

---

[61] FWS_002069.
[62] FWS_001938; FWS_002126.
[63] FWS_002135.
[64] FWS_LIT_010068.

high quality habitat, 2:1 for medium quality habitat, and 1:1 for low quality habitat.[65] FWS must

consider key questions to determine whether the habitat is of at least equal biological value, such

as:

> [W]hat value did the habitat lost have to the covered species? What value does the replacement habitat have to covered species (e.g., did the replacement habitat provide for the same life stage of the covered species as that lost)? Does the replacement ratio need to be greater than 1:1 to compensate for the lag time between impacts and full eco-function of the replacement habitat, to allow for restoration uncertainties, or is consistent with previously-defined recovery objectives? Is the identified conservation habitat likely to remain suitable in reasonably anticipated future climate scenarios? Is there more value to the species by replacing the habitat that is lost with a different habitat type (e.g. breeding vs. foraging habitat)?[66]

FWS must provide a reasonable basis for determining the number of acres needed to fully

offset the impacts based on quality and value of habitat taken and replaced.[67] Here, FWS failed

to do so and ignored key questions and directives provided in its handbook with no explanation.

When an agency "abandon[s] its own established procedure" set forth in its handbook, as FWS

did here, it essentially "catapult[s] over the real issues and analytical work required by its

handbook," and that means that the agency necessarily "did not adequately explain its result."[68]

FWS estimates that the GCP will likely result in the take of 7,152 prairie dogs and 1,750

acres (ac) of occupied prairie dog habitat; 73 % (1,278 ac) in the West Desert recovery unit, 14

% (244 ac) in the Paunsaugunt recovery unit, and 13 % (228 ac) in the Awapa Plateau recovery

unit.[69] FWS had no basis to determine that the ambiguous "greater than 1:1" or "at least 2:1"

ratios fully offset the impact of 1,750 ac of lost habitat or the 7,152 lost prairie dogs.

---

[65] FWS_LIT_010070.
[66] FWS_LIT_010068.
[67] FWS_LIT_010069-70.
[68] *Town of Barnstable v. FAA*, 659 F.3d 28, 34-36 (D.C. Cir. 2011).
[69] FWS_002070 (citing GCP *Table 12*); FWS_002256, 002161.

Instead of conducting the required analysis and calculations to determine the impact of the plan and whether it is offset, the GCP merely states that the prairie dogs will be translocated to federal land without providing any information about the quality or location of land being taken or replaced.[70] Despite FWS's claim that the mitigation strategy considers habitat quality,[71] FWS cannot make a determination that the habitat replaced will be of at least "equal biological value" to the habitat taken without knowing the location and quality of the habitat taken and replaced. Further, without this information, FWS cannot consider the HCP Handbook's key questions and calculations about the value of the habitat lost, habitat replaced, or mitigation ratio.[72]

In fact, FWS intentionally decided not to establish "a set mitigation ratio" to allow for "flexibility" even though the ambiguity bars FWS from knowing the exact acres and quality of land taken or replaced.[73] Knowing the location of translocation sites and other land used to mitigate the impact of the GCP is particularly important because "[a]djacent land uses should be considered when selecting translocation sites,"[74] and the recovery goals and criteria depend on maintaining sufficient connectivity and gene flows by "strategic placement of protected lands for Utah prairie dogs."[75]

Further, FWS had no basis to determine that sufficient suitable prairie dog habitat is actually available for translocations or conservation banks. There are many competing uses on

---

[70] FWS_002130-31, 002111 ("The specific location of each future development project over the duration of this GCP cannot be identified at this time.").
[71] FWS_001943.
[72] FWS_LIT_010068.
[73] FWS_002135.
[74] FWS_LIT_009522.
[75] FWS_LIT_009610.

federal lands and there is no indication that these lands have sufficient available suitable prairie dog habitat. Nor is there any indication that enough private land is available. Most federal lands occur on more arid landscapes and cannot provide high quality habitat for prairie dog translocations, which is why prairie dogs are healthier and more abundant in their current colonies on private land due to the presence of more moisture and food resources.[76] FWS failed to explain how the measures will fully offset the impacts given the low likelihood that there is enough suitable habitat available on federal lands. In fact, the GCP states that the existing conservation banks only have enough credits to "offset impacts of between 171 and 311 ac of Utah prairie dog occupied habitat that occur in the minor development area."[77] This does not come close to fully offsetting the 1,750-ac loss of habitat.

Without information regarding the quality, location, and biological value of habitat taken and replaced, and without considering the low likelihood that there is enough suitable habitat available, FWS can only speculate that the habitat replaced will be of at least "equal biological value" to the habitat taken. Thus, FWS's determination that the mitigation and minimization measures **will** fully offset the impacts of the take is arbitrary and capricious because it is without basis, speculative, and "runs counter to the evidence before the agency."[78]

FWS's failure to identify the location of mitigation sites also violates the ESA for two reasons. First, the ESA dictates that "if an agency plans to mitigate its project's adverse effects on an endangered species by acquiring habitat and creating a refuge, it must insure the creation

---

[76] FWS_002122.
[77] FWS_002134.
[78] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

of that refuge before it permits destruction or adverse modification of other habitat."[79] FWS

failed to do so here. Second, the ESA requires an agency to provide an "opportunity for public

comment, with respect to a permit application and the related conservation plan."[80] The

opportunity for comment "must be a meaningful opportunity."[81] The D.C. Circuit found that

plaintiffs "reasonably complained, they could not meaningfully comment on the mitigation value

of the off-site parcel without knowing its location."[82] The D.C. Circuit explained that "given the

Service's conclusion that the off-site mitigation area was necessary for approval of the

permit, there could not have been a meaningful opportunity to comment on the application

without a meaningful opportunity to comment on the site."[83] Here, the identification of

mitigation sites is crucial to make an informed decision about whether to issue the GCP and

ITPs. FWS's failure to identify these sites not only makes it nearly impossible to assess the

impact of future take of Utah prairie dog under the GCP, but also frustrates Friends of Animals

and the public's ability to meaningfully comment on the GCP and ITPs.

2. **The mitigation and minimization measures will not fully offset the impacts of the take.**

The GCP claims that a mitigation ratio of "at least 2:1" is the "minimum threshold,"[84]

however this "minimum threshold" will not fully offset the impacts of the take. FWS failed to

acknowledge or consider the extra habitat that would be needed due to the low success rate of

translocations. Less than ten percent of prairie dogs survive after the first year of translocation

---

[79] *Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987).
[80] 16 U.S.C. § 1539(a)(2)(B).
[81] *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002).
[82] *Id.*
[83] *Id.*
[84] FWS_002135.

and two-thirds of all new translocation sites fail.[85] Since two-thirds of translocations are unsuccessful, in order to fully offset the 1,750-ac loss, at least three times that amount of habitat (of the same or higher quality) would be needed to support translocations. Thus, the minimum threshold of at least 2:1 is insufficient.

In addition, as explained below, FWS fails to address the specific issues identified in the HCP Handbook, including (1) lag-time; (2) restoration uncertainties; and (3) previously defined recovery objections (i.e., connectivity and colony size and need to protect Utah prairie dogs on some private lands). All of these issues indicate that the mitigation ratio of at least 2:1 is insufficient.[86] Accordingly, FWS's determination that the mitigation ratio will fully offset the impacts of the take was arbitrary and capricious because it "entirely failed to consider" the low success rate of translocations, lag-time, restoration uncertainties, and previously-defined recovery objections, which are "important aspect[s] of the problem."[87]

The need for a greater mitigation ratio is evidenced by FWS's own review of the GCP. While drafting the GCP, FWS originally found that "[t]he applicant must commit to protect acreage at a minimum 3:1 ratio to offset the impacted habitats."[88] When a GCP drafter attempted to change the 3:1 ratio to a "greater than 1:1" ratio, FWS's conservation plans and grants coordinator expressly stated that she did not think FWS would be able to approve the change because the conservation bank must have an "uplift" and a greater than 1:1 ratio would not have that "uplift."[89] Further, the Solicitor's Office questioned whether the more protective 3:1 ratio

---

[85] FWS_LIT_009591; FWS_002132.
[86] *See supra* p. 15-17.
[87] *State Farm*, 463 U.S. at 43.
[88] FWS_SUPP_002374.
[89] FWS_SUPP_002373.

was sufficient and expressed concern about having a less than 3:1 ratio.[90] Without explanation, FWS eventually changed the mitigation ratio to "at least 2:1" or "greater than 1:1" despite the evidence that those ratios are insufficient. The reduced ratio is particularly concerning because FWS failed to consider the specific habitat that is being taken and replaced. Thus, FWS's determination that the mitigation ratio will fully offset the impacts of the take is arbitrary and capricious because it is not supported by a reasonable basis and "runs counter to the evidence before the agency."[91]

Since the GCP mitigation and minimization measures do not fully offset the impacts of the take, the Applicants must demonstrate that the GCP mitigates and minimizes the impacts to the maximum extent practicable. FWS refused to consider whether the GCP minimizes and mitigates to the maximum extent practicable[92] and thus, the Court should vacate and remand the GCP and ITPs. In any event, the GCP does not minimize or mitigate to the maximum extent practicable because the ESA requires "useful mitigation."[93] Mitigation commitments that will not protect the species in the long run will not minimize and mitigate the impacts of the take to the maximum extent practicable.[94] As explained above, the mitigation measures are not "adequate" because they will not protect the prairie dogs.[95] In addition, the Applicants will not mitigate the impacts to the "maximum extent practicable" because the Applicant "can feasibly do [] more" by implementing a higher minimum mitigation ratio of 3:1, including more requirements and

---

[90] FWS_SUPP_002374.
[91] *State Farm*, 463 U.S. at 43.
[92] *See, e.g.*, FWS_002069 ("Because the GCP would fully offset the impacts, including minimization and measures from past HCPs is not required.").
[93] *Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1146 (S.D. Cal. 2006).
[94] *Id.*
[95] *Nat'l Wildlife Fed'n*, 2005 U.S. Dist. LEXIS 33768, at *46.

guidance on land quality, and implementing measures from past HCPs.[96] FWS failed to explain why these measures were not practicable for the GCP. Thus, the GCP does not minimize or mitigate the impacts of the take to the maximum extent practicable.

### 3. The GCP's measure for success does not fully offset the impacts of the take.

The GCP's measure for success of the translocation plan is unreasonable and does not fully offset the impacts of the take. To fully offset the take of 100 individuals, the applicant must implement measures to fully offset the effects to the population or species from the loss of those 100 individuals, such as improving habitat or increasing population growth rate.[97] Here, FWS estimated a loss of 7,152 Utah prairie dogs over the ten-year duration of the GCP.[98]

FWS considers the translocation plan successful even if all prairie dogs on two-thirds of the translocation sites die, and the remaining one-third of the sites have a spring count of one prairie dog (which equates to 7.2 prairie dogs) for three out of five years (not necessarily consecutive).[99] However, this is **<u>not</u>** a good measure of success and does not fully offset the loss of 7,152 prairie dogs. To the contrary, successful prairie dog colonies should be connected to other colonies and should have a spring count of at least twenty prairie dogs because colonies with less than twenty "contribute little to the long term persistence of the species."[100] The mitigation cannot "fully replace[]" or be "equal" to the biological value lost when the measurement of success does not produce colonies that are equally as strong or as big as the

---

[96] FWS_LIT_010071.
[97] FWS_LIT_010068.
[98] FWS_002161.
[99] FWS_002140.
[100] FWS_LIT_009681, 009562.

colonies that are being taken.[101] This arbitrary measure conflicts with the HCP Handbook's key questions regarding the value and significance of the prairie dogs lost and replaced.[102] Thus, FWS's determination is arbitrary and capricious because it is "implausible" to conclude that having one-third of colonies with one prairie dog fully offsets the take of a large and biologically valuable colony.[103]

Further, Table 14 of the GCP estimates that 7,152 prairie dogs will be taken after minimization measures are implemented.[104] Moreover, there is no separate requirement or funding to ensure new habitat is created to mitigate the loss of habitat in major development areas and small colonies in minor development areas. Thus, the impacts of the take are not fully offset.

In addition, the GCP contains no clear guidance for monitoring long term success of translocation sites or conservation banks. The GCP claims applicants will evaluate whether conservation easements are: (1) cumulatively located in areas that promote prairie dog population and habitat connectivity, and (2) managed to the benefit of Utah prairie dogs.[105] However, there are no clear criteria for these evaluations and no guidelines to determine if the conservation easements are or are not meeting these standards. Thus, FWS cannot determine that the impacts will be fully offset by measures that have no criteria to meet.

---

[101] FWS_LIT_010066.
[102] FWS_LIT_010068.
[103] *State Farm*, 463 U.S. at 43.
[104] FWS_002160.
[105] FWS_002151.

**4. The GCP's minimization measure of translocation when feasible without any incentive is unenforceable and will neither fully offset nor minimize the impacts of the take to the maximum extent practicable.**

The primary minimization measure in the GCP is translocations "when feasible."[106] The GCP's definition of "feasible" does not fully offset the impacts of the take and is inconsistent with the ESA's requirement to minimize to the maximum extent practicable. FWS determines feasibility of translocations based on the "project proponent's development schedule."[107] A translocation is only deemed feasible in one of two ways: (1) if the developer determines it is convenient to schedule the project within the translocation season; or (2) if the project's schedule is known in advance and the developer determines translocation is consistent with their schedule and can occur in the translocation season prior to the development.[108] The translocation season generally lasts only two months, from July 1 to August 31.[109]

The ESA requires FWS to find "the applicant **will**, to the maximum extent practicable, minimize and mitigate the impacts of such taking."[110] The Secretary cannot make this finding "by relying on mitigation that the Services cannot enforce."[111] Translocations when "feasible," as defined by the GCP, are not mandatory or enforceable and will not fully offset or minimize the impacts to the maximum extent practicable because developers can avoid translocations if they develop outside prairie dog translocation season, if no translocation sites are available, or if the

---

[106] FWS_002126.

[107] FWS_002095.

[108] *Id.*

[109] *Id.*

[110] 16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added).

[111] *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1054 (N.D. Cal. 2015).

Utah Division of Wildlife Resources does not have funding to perform translocations.[112] The GCP does not require developers to fund or carry out this minimization measure, and there are no incentives for them to develop in accordance with a schedule that would promote successful prairie dog translocations. Minimization measures violate the ESA when they are "toothless" and allow "the City or developer to unilaterally determine" whether implementation of the measure is feasible.[113] Accordingly, without objective criteria to enforce the developer's commitment to increase habitat through translocations, FWS's conclusion that the developer will in fact minimize taking of the prairie dogs and their habitat by translocation is arbitrary and capricious.[114]

The GCP will not minimize to the "maximum extent practicable" because the GCP "can feasibly do [] more" to minimize the impacts of the take by providing incentives for translocations instead of a standard fee.[115] Under the 1998 Iron County HCP covering some of the same area, contractors were required to pay a fee if they chose not to translocate.[116] This fee was intended to provide an incentive for developers to translocate prairie dogs. When drafting the GCP, FWS initially required higher fees for individuals who did not translocate prairie dogs, and FWS's experts believed that this was an important requirement.[117] However, FWS inexplicably deleted the language about quality of translocation sites and creating incentives for

---

[112] FWS_002068.

[113] *Southwest Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1140 (S.D. Cal. 2006).

[114] *Klamath-Siskiyou Wildlands Ctr.*, 99 F. Supp. 3d at 1054.

[115] FWS_LIT_010071; FWS_002098, 002104.

[116] FWS_LIT_006210.

[117] FWS_SUPP_002344, FWS_SUPP_002317-18, 002323.

translocating in the GCP.[118] FWS failed to explain how a fee incentive is not practicable when previous plans included one.

   **5.   The GCP will not mitigate or minimize the impacts to the maximum extent practicable because it abandons feasible measures from current and past HCPs and does not implement additional practicable measures.**

   The GCP will not mitigate or minimize to the maximum extent practicable because the GCP abandons minimization and mitigation measures identified in a past HCP. The fact that counties have implemented these measures in the past demonstrates that they are practicable and the applicant "can feasibly do [] more" to minimize and mitigate the impacts.[119] For example, under the 1998 Iron County HCP, in addition to translocations and mitigation banks, minimization and mitigation measures included: education and training, measures to discourage unnecessary take, discouraging take outside of the translocation window, penalties for unnecessary take, habitat development, protection of existing habitat, and research on prairie dog conservation.[120] In addition, previous HCP's limited the total amount of prairie dogs that could be taken and translocated.[121] The GCP fails to implement these feasible measures or explain why these measures are not practicable. Thus, the GCP will not minimize and mitigate the impacts to the maximum extent practicable.

   The GCP also fails to include additional practicable measures that Friends of Animals suggested to minimize and mitigate the impact of takes. These suggestion include: (1) limits on the areas and amounts of prairie dogs that could be taken; (2) preservation of high quality

---

[118] FWS_SUPP_002322, FWS_002130-31.
[119] FWS_LIT_010071; FWS_002098, 002104.
[120] FWS_LIT_006217.
[121] FWS_LIT_006189-006190, 006203.

habitat, important colonies and connective corridors; and (3) seasonal restrictions on take to prevent takings during the breeding and young-rearing season.[122] FWS erroneously determined it did not need to consider these additional measures because it believes the minimization and mitigation measures will fully offset the impacts of the take.[123] Since the measures will not fully offset the impacts of the take, FWS cannot approve the GCP and ITPs without determining that the applicant will minimize and mitigate the impacts of the take to the maximum extent practicable. Thus, this Court must vacate and remand the GCP and ITPs.

**B. FWS's failure to consider GCP alternatives that avoid or reduce take violates the ESA and APA.**

FWS failed to consider GCP alternatives that avoid or reduce the take of Utah prairie dogs. The ESA requires applicants wishing to obtain an ITP to submit an HCP that specifies "what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized."[124] The alternatives should be "meaningful" and "the applicant should focus on significant differences in project design that would **avoid or reduce the take**" rather than "small changes in project implementation or minimization and mitigation measures that do not avoid or reduce take."[125] Some examples include "implementing the project in a different location or changing the project or land use in a way that would eliminate or reduce the take in a meaningful way (e.g., restricting the timing of certain timber harvest activities to when grizzly bears are denning)."[126] The Recovery Plan emphasizes the importance of limiting

---

[122] FWS_001231, FWS_001238.
[123] FWS_002069 ("Because the GCP would fully offset the impacts, including minimization and measures from past HCPs is not required.").
[124] 16 U.S.C. § 1539(a)(2)(A)(ii)-(iii).
[125] FWS_LIT_009998 (emphasis added).
[126] FWS_LIT_009998.

development on some non-federal lands and explicitly states that "[h]abitat connectivity can be ensured by setting aside open space or corridors as part of . . . HCP mitigation efforts.[127]

Here, FWS only considered two additional GCP alternatives: (1) a seasonal timing incentive – in which developers would have to pay a fee if they begin construction outside of the translocation season; and (2) no action.[128] However, the no action alternative is standard and the seasonal timing incentive alternative is neither "meaningful" nor does it avoid or reduce take. FWS claims that "[t]hese alternatives could result in less take then the GCP," however this directly conflicts with FWS's statement that the seasonal timing incentive alternative "would not result in conservation benefits greater than those provided in the GCP."[129] As FWS acknowledges, under previous Utah prairie dog HCPs for the same area, many developers did not take advantage of the incentives.[130]

During the comment period, Friends of Animals requested that FWS consider reasonable alternatives that avoid or reduce take, such as: (1) seasonal restrictions on development; (2) implementation of practicable measures identified in previous HCPs; (3) protection of crucial habitat, colonies, and connective corridors; and/or (4) having an enforceable limit on the amount of take.[131] These greater GCP alternatives are reasonable and practicable. FWS was initially persuaded by Friends of Animals' argument because after the comment period, FWS intended to consider a no take alternative and a seasonal restriction alternative.[132] However, FWS

---

[127] FWS_LIT_009606.
[128] FWS_002177-79.
[129] FWS_002073; FWS_002179.
[130] FWS_002178.
[131] FWS_001231, FWS_001238.
[132] FWS_SUPP_002683-84.

inexplicably reversed course and decided not to consider or include these alternatives in the GCP. FWS's failure to consider any meaningful alternatives that would avoid or reduce take violates the ESA requirements and is thus unlawful under the APA.[133]

### C.  FWS failed to demonstrate that the taking is not likely to reduce the likelihood of the survival and recovery of Utah prairie dogs in the wild.

Before issuing an ITP, Section 10(a)(2) of the ESA mandates that FWS find, among other things, that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."[134] In addition, Section 7(a)(2) of the ESA requires all federal agencies to formally consult with federal wildlife agencies to "insure that any . . . [agency action] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."[135] Jeopardy to the continued existence of a listed species means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[136] In this process, FWS must, among other things, "[e]valuate the effects of the action and cumulative effects on the listed species."[137] FWS is required to use the "best scientific and commercial data available" throughout the consultation and in making the decision whether the action is not likely to jeopardize the survival or recovery of a species.[138] The "consultation is

---

[133] 5 U.S.C. § 706(2)(A).
[134] 16 U.S.C. § 1539(a)(2)(B)(iv).
[135] 16 U.S.C. § 1536(a)(2).
[136] 50 C.F.R. § 402.02.
[137] 50 C.F.R. § 402.14(g)(3).
[138] 16 U.S.C. § 1536(a)(2).

more than a mere procedural requirement, as it allows FWS to impose substantive constraints on the other agency's action if necessary to limit the impact upon an endangered species." [139]

Here, the materials that FWS relied on for its finding do not support its conclusion that the GCP will not appreciably reduce the likelihood of the survival and recovery of Utah prairie dogs in the wild and is not likely to jeopardize the species. FWS's set of findings and biological opinion contain incomplete, conclusory statements that are not supported by the best available science.

According to FWS's own calculation, the cumulative impact of this plan, considering other baseline take, could result in the take of 12,653 prairie dogs annually, or seventeen percent of the population each year assuming the population does not decline. [140] FWS concludes that this "should not result in significant impacts to the Utah prairie dog population" by relying on a study that is largely inapposite and contradicts FWS's conclusion. [141] The study (Reeve and Vosburgh 2006) only addressed quotas for shooting Gunnison prairie dogs and did not consider habitat loss or fragmentation as will occur under the GCP. [142] This is an important distinction, because the study found that in a density dependent population, shooting a portion of the population may enhance population growth rates. [143] The same is not true where, like here, entire colonies may be

---

[139] *New Mexico ex rel. Richardson v. BLM,* 565 F.3d 683, 700 (10th Cir. 2009); 16 U.S.C. § 1536(b)(4).
[140] FWS_001683.
[141] FWS_001683 (citing Reeve and Vosburgh 2006).
[142] *Compare* FWS_LIT_007056-65 (Shooting Prairie Dogs, Reeve and Vosburgh 2006) *with* FWS_001671 (explaining type of take to occur under the GCP, including "loss or fragmentation of habitat").
[143] FWS_LIT_007059-61.

destroyed, and habitat is permanently loss. Thus, a population's ability to withstand a certain percent loss from shooting would differ significantly from the precent loss due to habitat loss.

Moreover, the key recommendation from the study was that harvest should not be based on a fixed quota.[144] It notes that using a fixed quota could cause the population to decline to extinction.[145] However, that is precisely what FWS does here. Take under the GCP is based on a fixed quota over the ten-year term of the permit—175 acres per year of occupied Utah prairie dog habitat or 1,750 acres for the term of the GCP and permits.[146] Moreover, unlike Gunnison prairie dogs, Utah prairie dogs are threatened with extinction by habitat loss and fragmentation, which is the primary threat to their continued existence.[147] The fact that the study FWS relies on does not support its conclusion is sufficient evidence to show that its conclusions are arbitrary and capricious.[148]

In addition, a more relevant study on the population viability of Utah prairie dogs concluded that the long-term species survival in the three recovery units is not assured given current abundance, geographic distribution, and threats.[149] Additional take would only further diminish the species' chance of survival and recovery. FWS ignored the more relevant study and instead misapplied the Reeve and Vosburgh study to make its findings under the ESA.[150] The best available data requirement "prohibits the Secretary from disregarding available scientific

---

[144] FWS_LIT_007061.
[145] FWS_LIT_007060.
[146] FWS_001685.
[147] FWS_LIT_009590.
[148] *Tucson Herpetological Society v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009) (finding that because the studies did not lead to the conclusion reached by FWS, these studies provided inadequate support in the administrative record for the determination made by FWS).
[149] FWS_LIT_007174.
[150] FWS_001673-76.

evidence that is in some way better than the evidence he relies on."[151] FWS did just that when it relied, inaccurately, on the Reeve and Vosburgh study and disregarded the more relevant study on Utah prairie dog viability.

Next, FWS concludes that the GCP should not affect the long-term recovery of the species because the majority of take would occur in major development areas.[152] However, this also directly conflicts with evidence in the record that shows prairie dog colonies and habitat in the major development areas do contribute to the long-term recovery of the species, and thus taking that habitat could significantly impede recovery and survival of Utah prairie dogs. For example, there are 46 medium and large colonies on non-federal lands in the major development areas.[153] The long-term persistence of the species "will require" the protection of large colonies and FWS's recommended strategy for achieving recovery includes ensuring the persistence of larger colonies distributed across the Utah prairie dog range in all recovery units.[154] The "most urgent recommendation" of the study on the population viability of Utah prairie dogs was to preserve prairie dogs on private land in the West Desert recovery area.[155] However, FWS estimates that the majority of take will occur in this recovery area under the GCP.[156] FWS failed to consider how losing important habitat in the West Desert Recovery Unit, and likely important connective corridors, could impact Utah prairie dogs.

---

[151] *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).
[152] FWS_001676.
[153] FWS_002170.
[154] FWS_LIT_009562.
[155] FWS_LIT_007174-75.
[156] FWS_001673 ("Approximately 73 percent of the loss of occupied Utah prairie dog habitat would occur in the West Desert recovery unit.").

Moreover, FWS's conclusions conflict with the findings and directives in the Utah Prairie Dog Recovery Plan. The Recovery Plan explains that development or urban expansion is the top threat to Utah prairie dogs.[157] It also repeatedly emphasizes that protecting existing colonies on non-federal lands, protecting land in all three recovery units, and ensuring connectivity in prairie dog colonies is necessary for the recovery of Utah prairie dogs.[158] The Recovery Plan states that the key to recovery is protection or enhancement of habitat in a way that, among other things "protects existing Utah prairie dog colonies in the long-term" and "protects corridors of connectivity between populations."[159]

Although FWS claims that mitigation and minimization measures will offset take by establishing new colonies or re-establishing previously existing colonies on federal or protected lands, there are not sufficient details or measures for FWS to conclude that the GCP is not likely to adversely affect the prairie dog's survival and recovery.[160] In particular, the creation or recreation of occupied habitat, especially for major development areas and small colonies in minor development areas, is dependent on translocations.[161] However, there are no assurances that that the estimated 70% of prairie dogs will be translocated pursuant to the GCP, especially

---

[157] FWS_LIT_009567.
[158] FWS_LIT_009605 ("[W]e now believe that increased conservation efforts on non-Federal lands (where the majority of the species' occupied habitat occurs) will be necessary to achieve recovery."); FWS_LIT_009610; FWS_LIT_009618 ("Due to the importance of private lands and the habitat they contain, it is likely necessary to conserve some habitat on private lands for Utah prairie dog conservation and recovery within all [Recovery Units]."); FWS_LIT_009610 ("The concept of representation is further supported by the species' need to have suitable habitat that is spatially distributed to provide connectivity"); FWS_LIT_009624 ("Maintaining connectivity between Utah prairie dog colonies is an important aspect of supporting viable populations that are spatially distributed in a manner to facilitate recovery.").
[159] FWS_LIT_009605.
[160] FWS_001677.
[161] FWS_001679.

since translocations are not required or incentivized and the 70% estimate is based on historical highs.[162] Moreover, the GCP fails to identify the location and quality of the sites where translocations will occur and fails to provide any funding to acquire or set aside lands as part of mitigation for take from these areas.[163] FWS also fails to identify the location and quality of the habitat that will be lost.[164] This undermines FWS's ability to determine the impact of the GCP and ignores issues in the Recovery Plan.[165]

Contrary to recommendations in the Recovery Plan, the GCP does not identify specific open space or corridors that must be set aside for conservation.[166] In fact, it does not require that any key habitat be conserved in the recovery units, nor does it even consider the quality of the habitat or its role in connecting Utah prairie dogs when providing developers permission to destroy habitat that may be necessary for recovery. FWS admits that it does "not know what the maximum amount of development would be over the 10-year term of the GCP.[167] All developers pay the same standard fee regardless of the quality of the habitat or the role it plays in ensuring the survival or recovery of Utah prairie dogs.[168] Development projects would not have a size

---

[162] FWS_002160.
[163] FWS_001677; *see* FWS_002182 (chart showing calculated mitigation need for take in major development areas is $0).
[164] FWS_002066 ("[T]he exact locations of all covered activities that will result in take are not known at this time because developers have not yet applied for building permits.").
[165] *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1191 (D.N.M. 2000) ("By merely reiterating its 'no impact' conclusion without any explicit references to common issues, FWS undermines its own credibility and does nothing to advise the public or waylay its concerns.").
[166] FWS_LIT_009606.
[167] FWS_001944.
[168] FWS_001657; FWS_002098.

limitation,[169] and habitat loss could increase from historical levels and be concentrated in minor development areas, with greater conservation value.[170]

The GCP allows take, including permanent habitat destruction, across the species' entire range on non-federal land.[171] It is undeniable that protecting some of this land—in strategic locations—is necessary for the survival and recovery of Utah prairie dogs.[172] However, FWS fails to identify any locations where take will be restricted and fails to disclose specific locations where habitat destruction will occur. Thus, FWS cannot determine that the GCP is not likely to adversely impact the species' survival and recovery, nor can it determine the taking will not appreciably reduce the likelihood of the survival and recovery of Utah prairie dogs without information about the specific location of take.[173]

Finally, FWS did not use a consistent data set in its analysis. Instead, FWS only selected data that serves its final decision. For example, FWS's estimate of occupied habitat that will be taken under the GCP is based on a five-year average of habitat taken from 2014 to 2017.[174] However, when translating this to the number of prairie dogs that would be taken, the GCP used

---

[169] FWS_002250.

[170] FWS_002158.

[171] FWS_LIT_009559.

[172] *See, e.g.,* FWS_LIT_009610 ("[R]ecovery objective 1 will require strategic placement of protected lands for Utah prairie dogs); FWS_LIT_009541 ("[W]e emphasize conserving extant colonies, many of which occur on non-Federal lands"); FWS_LIT_007174 ("[S]urvival of this species depends critically on the preservation of existing prairie dog colonies."); FWS_LIT_009602 ("[P]rotection of the entirety of existing colonies is **necessary** to maintain prairie dog population dynamics.") (emphasis added).

[173] *Middle Rio Grande Conservancy Dist.,* 206 F. Supp. 2d at 1168 (finding that regardless of how federal agency interpret the ESA, the action must be set aside where the "the record fails to establish either an in-depth analysis of facts and circumstances or a sound rational basis for the choices made").

[174] FWS_002157-59, FWS_001671 (Biological Opinion merely incorporated data from the GCP regarding the effects of take).

spring counts from earlier years, 2010 to 2014.[175] By excluding data from recent spring counts with a higher numbers of Utah prairie dogs,[176] the GCP lowers the estimated take. FWS never provided any rationale for using older data to estimate the number of prairie dogs that will be lost under the GCP. The GCP again changes its dataset when it estimates how many prairie dogs will be translocated. Rather than use the same years it references to estimate the loss of habitat or prairie dogs, the GCP assumes that the percent of prairie dogs that are translocated will be the same percent of prairie dogs translocated in 1998, 2001, and 2002—three out of the last twenty years where Iron County had the highest level of translocations.[177] Not only is this bad science, but it is also a critical flaw in FWS's analysis because Applicants acknowledge that there is not sufficient funding to support historically high numbers of translocations. For example, the State could not support the same number of translocations that occurred in 2015, explaining that "this high level of translocation in 2015 of 2,663 would be difficult to sustain over time for several reasons, including lack of adequate funding and staffing, availability of large source populations, and the availability of a high number of translocation sites year to year."[178] Again, there is no reason for FWS to continually alter its dataset to claim that a large number of prairie dogs will be translocated, but then (use another dataset) when it is responsible for ensuring adequate funding to actually carry out the program.[179]

---

[175] FWS_002123, n.3.
[176] *See* FWS_002234.
[177] FWS_002160.
[178] FWS_002162.
[179] *Conservation Law Found. v. Watt,* 560 F. Supp. 561, 573 (D. Mass. 1983).

### D.  FWS failed to ensure there was adequate funding for the GCP.

Before issuing an ITP, FWS must find, among other things, that the applicant has assured adequate funding for its HCP.[180] FWS claims that there will be adequate funding for the GCP based on Applicants' cost estimate, the State's past contribution to Utah prairie dog recovery efforts,[181] and standard fees to be collected to mitigate the loss of medium and large colonies in minor development areas.[182]

However, there are several flaws with this finding. First, the implementation agreement demonstrates that Applicants have not assured adequate funding. It admits that Applicants will only provide funding "as available."[183] Neither Federal nor State funds have been appropriated to carry out the measures identified in the GCP. This alone is sufficient to set aside the HCP.[184]

In addition, regarding take in all major development areas, as well as some small colonies in minor areas, the funding estimate erroneously assumes that the State will carry out other prairie dog conservation programs but fails to identify funding for those programs. It also fails to identify available lands to carry out the mitigation and minimization, or funding to purchase new lands. Regarding take in minor development areas, the funding estimate depends on the take being below historical estimates and fails to require retroactive fee increases if funding is deficient. Finally, throughout the funding estimate calculation, Applicants rely on inconsistent data.

---

[180] 16 U.S.C. § 1539(a)(2)(B)(iii).
[181] Applicants state that the State's average annual contribution to Utah prairie dog recovery efforts have exceeded $340,000 since 2005. FWS_002179.
[182] FWS_001949.
[183] FWS_001909.
[184] *Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1155 (S.D. Cal. 2006).

1. **FWS failed to ensure adequate funding to mitigate habitat loss in major development areas and erroneously assumed there is sufficient space, free of charge, on public or private land to implement mitigation and minimization measures.**

Although the GCP uses a standard fee to cover the costs of mitigation for the development in minor development areas, the taking of Utah prairie dogs under the GCP does not include any fees to cover the cost of implementing mitigation and minimization measures in the major development areas. Instead, FWS relies on the State to provide the fees for these measures. However, there is no evidence the State will have sufficient funds. Specifically, FWS's finding that the Applicants have assured adequate funding fails to consider a significant aspect of the problem — that the amount of funds the State contributes to Utah prairie dog recovery will not be spent exclusively on this GCP. FWS adopted Applicants' cost estimates for the GCP, up to $157,434, and found that this amount is likely available because the State's average annual contribution to Utah prairie dog recovery efforts have exceeded $340,000 since 2005.[185] However, according to Applicants' own calculations, the State's annual prairie dog translocation efforts are estimated to cost $408,596.[186] Neither the Applicants, nor FWS, ever indicates that such funding is assured.

Applicants attempt to downplay the cost of the GCP, as opposed to the total cost of expected translocations, by estimating a per prairie dog cost.[187] Critically, this estimate is contingent on the State implementing another program for translocations independent of development and the translocation of 1,500 prairie dogs per year.[188] Neither the Applicants, nor

---

[185] FWS_001948.
[186] FWS_002255.
[187] FWS_002255.
[188] FWS_002254.

FWS, identify funding to cover both programs. Without identifying funding for the translocations that the Applicants rely on in their calculations, there is no reasonable basis for FWS to conclude that the Applicants have ensured adequate funding for the GCP.

Next, as discussed above, FWS did not use a consistent data set to determine the impact and the cost of the GCP. Instead, FWS arbitrarily selects data that serves it final decision.[189] By switching its predictions when determining the cost of carrying out the GCP, FWS failed to ensure adequate funding for the actual GCP and the estimated take.

Finally, FWS fails to identify sufficient free space and/or funding to purchase space to create new prairie dog habitat and conduct necessary mitigation and minimization for take from major development areas and small colonies in minor development areas. Translocation is the main mitigation and minimization plan under the GCP.[190] This includes establishing new translocation sites and colonies.[191] The GCP explicitly states that, although the focus would be on federal lands, "new colonies could be established on non-Federal lands that are protected for prairie dog conservation through conservation banks, conservation easements, or land acquisitions."[192] However, the GCP does not include this in its funding estimate.[193] Instead, it only contemplates purchasing conservation easements, land acquisitions, or conservation bank credits for the loss of habitat on medium or large colonies in minor development areas.[194] The fee calculations' failure to consider the costs to purchase land to carry out the mitigation and

---

[189] *See supra* p. 33-34.
[190] FWS_002126-29.
[191] FWS_002126-27; FWS_002131.
[192] FWS_002132.
[193] FWS_002255.
[194] FWS_002129.

minimization measures for take in major development areas is critical since FWS found that the majority of take will likely occur in these areas.[195] Notably, the GCP also fails to identify land that is already available to carry out its mitigation and minimization for these areas. Without land or money to purchase land necessary to carry out the GCP's minimization and mitigation measures for development in major areas and on small colonies in minor areas, FWS cannot conclude that Applicants ensured adequate funding to carry out the Plan.

2. **FWS failed to ensure adequate funding to mitigate habitat loss in minor development areas.**

FWS acknowledges that it does "**not know** what the maximum amount of development would be over the 10-year term of the GCP. Therefore, to provide a range of possible impacts, the stepped-up estimate is a 5-fold increase of the habitat loss estimate based on historical averages."[196] However, the funding calculation for mitigation costs in minor development areas does **not** take into account the stepped-up approach, nor does it take into account the historical approach used in the other portions of the GCP. Specifically, the GCP historical estimate assumes that 350 acres of habitat, ten percent of which is in minor development areas, would be taken over the ten-year term of the plan.[197] This estimate is based on the development occurring at essentially the same rates it did in 2014-2017.[198] However, the estimated cost of mitigation is not tied to this historical approach. Instead, Applicants reduced the estimated cost of mitigation for take in minor development areas by basing fee options on actual take that occurred in earlier

---

[195] FWS_001948.
[196] FWS_001944 (emphasis added).
[197] FWS_002157.
[198] *Id.*

years, 2012-2016.[199] FWS never explained why it would not base its cost estimate on the same data it used to estimate take.

Although the GCP does indicate that the counties can reevaluate the standard fees, it would not do so until three years **after** it has issued permits, and then only if it is $10,000 or more deficient.[200] Even if the fees were short more than $10,000, nothing would be required of existing permit holders, whose fees would not increase.[201] Instead, the increase would only apply to future development. There are at least two major problems with this. First, there are no assurances that future projects, which may be deterred from increased costs, can make up the deficiency. Second, there are no assurances that the prairie dog habitat that is already lost will ever be mitigated or offset. As FWS recognizes, the ability to complete land acquisitions would be dependent on the amount of funds collected and "in most cases it would take multiple years to accrue sufficient monies in the conservation fund to complete priority recovery actions."[202] On top of the delay between issuance of permits and mitigation measures, there is no limit on how much land can be developed each year, and the counties only need to evaluate the standard fee every three years.[203] Thus, any deficiency in the standard fees, which are not based on a reasonable estimate to start with, might not become apparent until significant prairie dog habitat has been destroyed. There are no assurances that future development could shoulder the outstanding mitigation obligations. Moreover, FWS and the counties fail to account for inflation

---

[199] FWS_002181.
[200] FWS_001907; FWS_002253; FWS_001951.
[201] FWS_001907.
[202] FWS_002183.
[203] FWS_001909.

or changing land values, which are likely to further increase the cost of implementing the GCP and may not be apparent until after habitat is destroyed.

At least one other court found that the agency's decision that the applicant ensured adequate funding is arbitrary and capricious where, like here, it provided that retroactive fee increases are not allowed.[204] This is particularly concerning where, as here, mitigation lands are purchased after fees are collected.[205]

### E.  In issuing the GCP, FWS failed to comply with NEPA.

The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, is our nation's basic charter for environmental protection. Congress enacted NEPA for two central purposes.[206] First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting.[207] Second, Congress sought to provide the public with a statutory means for being informed about, and commenting on, the environmental impacts of proposed agency action.[208] Thus, when an agency plans to undertake a federal action that significantly affects the quality of the human environment, it must prepare a detailed environmental impact statement (EIS) including "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action."[209] In the EIS, a federal agency must: (1) "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action, 42 U.S.C. §

---

[204] *Nat'l Wildlife Fed'n v. Babbitt*, 128 F.Supp.2d 1274 (E.D. Cal. 2000).
[205] *Id.*
[206] *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).
[207] *Id.* (citing *Vermont Yankee v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978)).
[208] *Id.* (citing *Weinberger v. Catholic Action of Hawaii/Peace Education Proj.*, 454 U.S. 139, 143 (1981)).
[209] 42 U.S.C. § 4332(2)(C).

4332(2)(C); 40 C.F.R. § 1502.14; (2) identify and disclose to the public all direct, indirect, and cumulative impacts of the proposed action and each reasonable alternative, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.16, 1508.7 – 1508.8; and (3) consider possible mitigation measures to reduce such impacts to the environment, 40 C.F.R. § 1502.14(f).[210] An agency may prepare an Environmental Assessment (EA) to decide whether the environmental impact of the proposed action is significant enough to warrant preparation of an EIS.[211] An EA must take a "hard look" at the potential consequences of the proposal and provide enough evidence and analysis for determining whether to prepare an EIS.[212]

Here, FWS failed to comply with NEPA in three fundamental ways. First, in preparing an EA, the agency wrongly concluded that approval of the GCP and ITPs would not significantly affect the quality of the human environment, and therefore, refused to prepare a more detailed EIS as required by the statute. Whether an agency action is "significant" enough to require preparation of an EIS requires "considerations of both context and intensity."[213] The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality."[214] The intensity of an action refers to the "severity of impact" and requires consideration of several factors, including the degree to which the effects

---

[210] The Council on Environmental Quality updated the regulations implementing NEPA on July 16, 2020. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020). These regulations do not have retroactive effect. Thus, citations within this brief are to the earlier regulations that were in effect at the time the ITPs were issued.
[211] 40 C.F.R. § 1508.9.
[212] *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985)*; Silverton Snowmobile Club v. United States Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006).
[213] 40 C.F.R. § 1508.27.
[214] 40 C.F.R. § 1508.27(a).

may be controversial; unique characteristics of the geographic area; the degree to which the effects are highly uncertain or involve unique or unknown risks; the precedential effect of the action; whether the action is related to other actions with cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species; the degree to which the action may adversely affect scientific, cultural, or historical resources; and whether the action threatens a violation of other laws intended to protect the environment.[215]

Both the context and intensity of the proposed action indicate that preparation of an EIS is necessary. First, the conservation of Utah prairie dogs is a highly controversial issue and has been the subject of litigation between property owners/developers and ESA proponents since 2015. The impacts from the proposed GCP would not only extend to property owners in all three counties, but also to members of the public across the nation who are interested in Utah prairie dogs. It would also impact prairie dogs across their entire range and could drastically alter the environment in which Utah prairie dogs play a key role. The long ten-year term of the GCP will only exacerbate these impacts.

The intensity of the proposed GCP also indicates that preparation of an EIS is warranted. It is undisputed that the impacts are controversial and the effects are highly uncertain and involve unique and unknown risks. For example, the EA admits that overall effects to the prairie dog population are difficult to determine, and that it is not known how much of the estimated take associated with development under the GCP is additive or compensatory.[216] The fact that the amount of take, specific location of take, and the minimum habitat requirements for Utah prairie

---

[215] 40 C.F.R. § 1508.27(b).
[216] FWS_002002, FWS_002024.

dogs continued survival are not disclosed presents unique and unknown risks.[217] The proposed GCP also occurs across the Utah prairie dog range, and thus will adversely affect at least one threatened species: Utah prairie dogs. The proposed GCP will also likely impact several other species that rely on Utah prairie dogs.[218] The GCP covers important cultural and historical resources, including tribal, cultural, and sites.[219] The EA admits that activities could disturb archaeological sites and historic resources and would be evaluated on a project-specific and site-specific basis by the federal land management agencies that will carry out these activities.[220] However, such information should be disclosed in an EIS, and the public should have an opportunity to comment on it.

Second, for reasons already discussed in Part B of the ESA argument above, FWS wholly failed to consider other reasonable alternatives to issuance of the GCP other than that requested by the Counties in their ITP applications. Notably, the Counties sought to remove take limits and other restriction on development activities not already covered by the 2012 FWS regulations for Utah prairie dogs. In essence, each of the alternatives considered in the EA focused on the lifting of these restrictions with the implementation of mostly voluntarily translocation to make up for the loss of existing prairie dog habitat.[221] However, FWS refused to consider reasonable alternatives with greater mitigation, such as: (1) seasonal restrictions on development; (2)

---

[217] *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1316 (S.D. Ala. 2002) (finding agency Finding of No Significant Impact was not appropriate where agency failed to "cogently identify, under its habitat analysis, the minimum habitat requirements for the continued survival-let alone recovery-of the species.").
[218] FWS_002008-10.
[219] FWS_002012-13.
[220] FWS_002013.
[221] FWS_001981-91.

implementation of practicable measures identified in previous HCPs; (3) protection of crucial habitat, colonies, and connective corridors; and/or (4) having an enforceable limit on the amount of take.[222] Notably, it cannot be argued that these alternatives are unreasonable, as some were included in past HCP and other regulations relating to Utah Prairie Dogs.[223]

Third, as also already discussed in Part A.1 of the ESA argument above, FWS failed to provide a reasonable discussion of the proposed mitigation measures to reduce the impact of the certain take of Utah prairie dogs. Although FWS identified translocation as a means of mitigation, the discussion lacks any specificity, makes nothing but assumptions, and contains no meaningful analysis.[224] For any of these reasons, the Court can find that FWS's approval of the GCP violated NEPA and vacate and remand the GCP and ITPs.

**CONCLUSION**

For the reasons stated above, this Court should vacate and remand the GCP and ITPs.


Date: March 25, 2021                                      /s/ Jennifer Best

                                             Jennifer Best
                                             Friends of Animals
                                             7500 E. Arapahoe Road, Suite 385
                                             Centennial, CO 80112
                                             (720) 949-7791
                                             jennifer@friendsofanimals.org

                                             Counsel for Plaintiff

---

[222] FWS_001238, FWS_002068.
[223] *See supra* p. 24.
[224] *Oregon Nat. Res. Council v. Marsh*, 832 F.2d 1489, 1493 (9th Cir. 1987) (citing 40 C.F.R. § 1502.16(h)), *rev'd on other grounds*, 490 U.S. 360 (1989) (the EIS must analyze the mitigation measures in detail and explain the effectiveness of the measures).

46

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limitation of DUCivR 7-4, and Fed. R. App. P.

32(a)(7)(B), of 13,000 words, because excluding the parts of the document exempted by Fed. R.

App. P. 32(a)(7)(B), this document contains 12,973 words.

This document complies with the typeface requirements DUCivR 10-1 because the type

is Times New Roman in 12-point font size.

Date: March 25, 2021                          /s/ Jennifer Best

                                              Jennifer Best
                                              Friends of Animals
                                              7500 E. Arapahoe Road, Suite 385
                                              Centennial, CO 80112
                                              (720) 949-7791
                                              jennifer@friendsofanimals.org

                                              Counsel for Plaintiff