THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| FRIENDS OF ANIMALS,<br><br>                    Plaintiff,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR REVIEW OF AGENCY ACTION**<br><br>Case No. 4:18-CV-00053-DN-PK<br><br>District Judge David Nuffer |

On August 22, 2018, Friends of Animals filed a Complaint against the United States Fish and Wildlife Service ("Agency").[1] The central aim of Friends of Animals' Complaint is to vacate and remand the Agency's decisions approving General Conservation Plan ("GCP") and Incidental Take Permits ("Take Permits") because these decisions permit entities to engage in activities that may harm the Utah prairie dog population. Friends of Animals argues the Agency's decisions in approving the GCP and Take Permits were arbitrary and capricious, and that these decisions should be vacated pursuant to the Administrative Procedure Act ("APA").

Friends of Animals filed its Opening Brief on March 25, 2021.[2] That Opening Brief functions as a Motion for Review of Agency Action.[3] The Agency filed a Response,[4] and Friends of Animals filed a Reply.[5] Friends of Animals filed a Notice of Supplemental Authority[6] that

---

[1] Complaint docket no. 2, filed August 22, 2018.

[2] Plaintiff's Opening Brief docket no. 74, filed March 25, 2021 ("Friends of Animals Opening Br.").

[3] DUCivR 7-4.

[4] Defendant's Answer Brief docket no. 77, filed June 10, 2021 ("Agency Response").

[5] Plaintiff's Reply docket no. 79, filed July 8, 2021.

[6] Notice of Supplemental Authority, docket no. 85, filed September 16, 2024.

addressed the United States Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*.[7] The Agency filed a Response[8] to Friends of Animals Notice of Supplemental Authority. Based on the parties' submissions, the evidence in the record, and supplemental authority, Friends of Animals' Motion is DENIED.

### Table of Contents

| | | |
|---|---|---|
| I. | Background | 3 |
| | A. Endangered Species Act | 3 |
| | B. The Utah Prairie Dog | 4 |
| | C. The Agency's Conservation Methods for the Utah Prairie Dog | 5 |
| II. | The Administrative Procedure Act | 5 |
| III. | Discussion | 7 |
| | A. Friends of Animals has standing to challenge the Agency's GCP, and the GCP constitutes a final agency action | 8 |
| |    1. Friends of Animals has standing to challenge the Agency's GCP | 8 |
| |    2. Friends of Animals challenged a Final Agency Action | 10 |
| | B. The GCP will minimize and mitigate the take of the Utah prairie dog to the maximum extent practicable | 13 |
| |    1. The GCP was not required to specify every facet of its conservation plan before a permit is sought for a development project | 15 |
| |    2. The GCP's mitigation and minimization measures did not violate the Endangered Species Act's requirement that the take of the Utah prairie dog is limited to the maximum extent practicable | 16 |
| |    3. The GCP's "when feasible" limitation for translocations does not violate the Endangered Species Act | 20 |
| |    4. The GCP's omission of mitigation and minimization measures from past HCPs and other conservation measures does not prevent the GCP from offsetting take of the Utah prairie dog to the maximum extent practicable | 22 |
| | C. The Agency was not required to consider alternatives to the GCP under the Endangered Species Act's subsections (a)(2)(A)(ii)-(iii) | 25 |
| | D. The Agency's conclusion that the take associated with the GCP would not jeopardize the continued existence of the Utah prairie dog was not arbitrary and capricious | 26 |
| | E. The Agency's conclusion that there was adequate funding for the GCP was not arbitrary and capricious | 29 |
| | F. The Agency's decision to issue the GCP did not violate the National Environmental Policy Act | 32 |
| |    1. The Agency's conclusion that the GCP would not significantly affect the quality of the human environment was not arbitrary and capricious | 32 |

---

[7] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

[8] Defendant's Response to Plaintiff's Notice of Supplemental Authority, docket no. 86, filed September 20, 2024.

|  | 2. | Friends of Animals did not establish the Agency failed to consider a reasonable range of alternatives to the GCP. | 35 |
|  | 3. | The Agency discussed mitigation measures | 37 |
| IV. | ORDER | | 38 |

# I.     BACKGROUND

## A.  Endangered Species Act

Congress enacted the Endangered Species Act to conserve endangered species and the ecosystems in which they live.[9] The Endangered Species Act prohibits the taking (i.e., harming) of any endangered or protected species of fish or wildlife within the United States.[10] The Endangered Species Act contains an exception to the taking prohibition that allows the Agency to issue permits (i.e., "Take Permits") to non-federal entities authorizing take where the harm to the protected species is "incidental to" the lawful activity.[11] However, the permit may not be issued unless the applicant for a permit submits a Habitat Conservation Plan ("HCP") that specifies:

> (i) the impact that will likely result from the incidental take;
> (ii) what steps the applicant will take to minimize and mitigate impacts . . .
> (iii) what alternative actions the applicant considered and the reasons these alternatives were not used; and
> (iv) such other measures that the Secretary may require as necessary or appropriate for the purposes of the plan.[12]

After the HCP is submitted, the Secretary of the Agency shall issue the permit if the Secretary finds that:

> (i) the taking will be incidental;
> (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
> (iii) the applicant will ensure that adequate funding for the plan will be provided;

---

[9] Agency Response at 3.

[10] *Id*. at (citing 16 U.S.C.§ 1538(a)(1)(B), (G)).

[11] *Id*. at 4 (quoting 16 U.S.C.§ 1539(a)(2)(B)).

[12] *Id*. at 4 (quoting 16 U.S.C.§ 1539(a)(2)(A)); *see also* 50 C.F.R. §§ 17.22(b)(1).

(iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
(v) the measures, if any, [that the Secretary requires as necessary and appropriate] will be met; and [the Secretary] has received such other assurances as he may require that the plan will be implemented.[13]

### B. The Utah Prairie Dog

The Utah prairie dog has certain characteristics that make it difficult for government agencies to estimate its population. The vast majority of Utah prairie dogs have a lifespan of less than four years and fewer than 50% survive to breeding age under natural conditions.[14] The population count of the Utah prairie dog typically occurs between April 1st and June 1st ("spring count") because that is the time period before the young prairie dogs are above ground.[15] The spring counts typically underestimate the actual number of adult prairie dogs because only 40-60% of individual prairie dogs are above ground at any one time.[16] Based on this percentage and a variety of other factors, the spring count is multiplied by 7.2 to create an estimate of the Utah prairie dog population.[17] Across eight counties in Utah, the Utah prairie dog population neared 100,000 in the 1920s, but by 1972 the estimated population was 3,300.[18] The Utah prairie dog was listed as an endangered species in 1973.[19] In 1984, the Utah prairie dog recovered; it was downlisted from endangered to threatened; and its estimated population was 18,158.[20] Since

---

[13] 16 U.S.C.§ 1539(a)(2)(B).

[14] Agency Response at 19 (citing Back-Tailed, Gunnison's and Utah Prairie Dogs Reproduce Slowly at FWS_LIT_005984, 005986).

[15] GCP at FWS_002098.

[16] GCP at FWS_002098.

[17] GCP at FWS_002098-99.

[18] Friends of Animals Opening Br. at 3.

[19] Friends of Animals Opening Br. at 3.

[20] Agency Response at 25.

1984, the Utah prairie dog's population has further recovered with the Agency estimating the Utah prairie dog population at 73,562 in 2018.[21]

### C.  The Agency's Conservation Methods for the Utah Prairie Dog

The Agency uses a variety of mitigation techniques (i.e., restoration of habitats, conservation banks, land acquisitions, conservation easements, and plague management) to offset the prairie dog's habitat that is impacted by development projects. The Agency also uses a mitigation ratio that reflects the amount of habitat conserved versus the amount of habitat impacted by each development project.[22] For the Utah prairie dogs, the Agency uses a mitigation ration of 2:1, which means two acres of habitat will be conserved for every one acre of high-quality habitat that is impacted by the project.[23] The Agency also has the flexibility to go above the 2:1 mitigation ratio if the habitats that are to be purchased cost more per acre.[24] Additionally, the Agency utilizes translocation to minimize the take of the Utah prairie dog. Translocation is the process of relocating Utah prairie dogs from land that will be developed to a protected habitat.[25]

### II.    THE ADMINISTRATIVE PROCEDURE ACT

The Endangered Species Act does not "provide a private cause of action for the claims asserted by [plaintiffs] —courts consider such claims through the [Administrative Procedure

---

[21] Agency's Response at 24 (stating the spring count of the Utah prairie dog was 1,866 in 1976, which means that the estimated population was 13,435). The spring count is multiplied by 7.2 to determine an estimated population. GCP at FWS_002098-99 ("Spring counts in these tables were converted to total population estimates by multiplying by 7.2[.]").

[22] GCP at FWS_002135.

[23] GCP at FWS_002135. The Agency employed a 1:1 conservation ratio for lower quality habitat. Agency Response at 20.

[24] GCP at FWS_002136.

[25] GCP at FWS_002130.

Act].”[26]  The Administrative Procedure Act (“APA”) requires a reviewing court to set aside final agency action that is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.”[27]  An agency action is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[28]

In other words, “[t]he Court determines only whether the [agency] examined ‘the relevant data’ and articulated ‘a satisfactory explanation’ for [its] decision, including a rational connection between the facts found and the choice made.”[29]

In *Loper Bright Enterprises v. Raimondo*, the United States Supreme Court recently overruled *Chevron* and explained the extent that federal courts properly defer to federal agencies’ interpretations of statutes.[30] Under *Chevron*, courts were to defer to the agency’s interpretation for “ambiguities of all stripes,” which included “cases having little to do with an agency’s technical subject matter expertise.”[31] In *Loper Bright Enterprises v. Raimondo*, the Supreme Court overruled *Chevron* and held: “An agency’s interpretation of a statute cannot bind a court[.]”[32] Additionally, the Supreme Court reasoned “the court ‘need not and under the APA

---

[26] *W. Watersheds Project v. Haaland*, 69 F.4th 689, 698, 700 (10th Cir. 2023) (analyzing whether the United States Forest Service violated the APA when it adopted a plan that authorized the taking of 72 grizzly bears).

[27] *Licon v. Ledezma*, 638 F.3d 1303, 1307–08 (10th Cir. 2011) (citing 5 U.S.C. § 706(2)(A)).

[28] *Id.* at 1308.

[29] *W. Watersheds Project v. Vilsack*, 696 F. Supp. 3d 1033, 1041 (D. Wyo. 2023) (internal quotation marks omitted).

[30] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2267 (2024).

[31] *Loper Bright Enterprises*, 144 S. Ct. at 2267.

[32] *Loper Bright Enterprises*, 144 S. Ct. at 2247 (citing *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n.8 (1983)).

may not defer to an agency interpretation of the law simply because a statute is ambiguous.' "[33] The court must exercise its "independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."[34] However, an agency's interpretation of a statute "may be especially informative to the extent it rests on factual premises within [the agency's] expertise."[35] "[W]hen the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority."[36]

"Courts exercising independent judgment in determining the meaning of statutory provisions . . . may . . . seek aid from the interpretations of those responsible for implementing particular statutes."[37] "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."[38] "The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries."[39]

## III.    DISCUSSION

Friends of Animals argues the Agency's Decision to approve the General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Development Areas ("GCP") was arbitrary and capricious because: (1) the GCP will not fully offset the impacts of the take of Utah

---

[33] *Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *8 (D. Kan. July 2, 2024) (quoting *Loper Bright Enterprises*, 144 S. Ct. at 2273)).

[34] *Id.* (quoting *Loper Bright Enterprises*, 144 S. Ct. at 2273)).

[35] *Loper Bright Enterprises*, 144 S. Ct. at 2267.

[36] *Id.*

[37] *Loper Bright Enterprises*, 144 S. Ct. at 2247 (citations omitted).

[38] *Id.* at 2263.

[39] *Id.* at 2263.

prairie dogs;[40] (2) the Agency's failure to consider GCP alternatives that avoid or reduce take violates the Endangered Species Act and the APA;[41] (3) the Agency failed to demonstrate that the taking is not likely to reduce the likelihood of the survival and recovery of Utah prairie dogs in the wild;[42] (4) the Agency failed to ensure there was adequate funding for the GCP;[43] and (5) the Agency failed to comply with the National Environmental Policy Act when it issued the GCP.[44] In response, the Agency argues: (1) Friends of Animals lacks standing;[45] (2) Friends of Animals failed to challenge a Final Agency Action;[46] (3) the Agency complied with the Endangered Species Act;[47] and (4) the Agency complied with the National Environmental Policy Act.[48]

> ### A. Friends of Animals has standing to challenge the Agency's GCP, and the GCP constitutes a final agency action

> #### 1. Friends of Animals has standing to challenge the Agency's GCP

Article III of the United States Constitution limits federal jurisdiction to cases and controversies. "The Supreme Court has interpreted this to mean parties must have standing to bring cases in federal courts."[49] To establish standing, an organization must show that: "(1) at least one of its members has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

---

[40] Friends of Animals Opening Br. at 2, 12-26.

[41] Friends of Animals Opening Br. at 27-29.

[42] Friends of Animals Opening Br. at 29-36.

[43] Friends of Animals Opening Br. at 37-42.

[44] Friends of Animals Opening Br. at 42-46.

[45] Agency Response at 10-12.

[46] Agency Response at 13-15.

[47] Agency Response at 15-36.

[48] Agency Response at 36-48.

[49] *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1286 (10th Cir. 2024).

challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[50] "We refer to these three familiar requirements as injury in fact, causation, and redressability."[51] "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."[52] "The party invoking federal jurisdiction bears the burden of establishing standing."[53]

"On the second requirement, to show that an injury is 'fairly traceable' to the challenged conduct, a plaintiff must allege "a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."[54] Specifically,

> a plaintiff must establish that its injury was "not the result of the independent action of some third party not before the court." This showing, however, does not require a plaintiff to establish that the defendant was the proximate cause of its injury. Nor does it require a showing that a "defendant's actions are the very last step in the chain of causation. Rather, at the motion to dismiss stage, a plaintiff can satisfy the "fairly traceable" requirement by advancing allegations which, if proven, allow for the conclusion that the challenged conduct is a "but for" cause of the injury.[55]

The Agency argues that Friends of Animals lacks standing because: (1) the GCP did not cause any injury to Friends of Animals' members because it is merely a general regulatory framework that did not authorize the taking of any Utah prairie dogs, and the Take Permits issued by state

---

[50] *Producers of Renewables United for Integrity Truth & Transparency v. Env't Prot. Agency*, No. 19-9532, 2022 WL 538185, at *4 (10th Cir. Feb. 23, 2022); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.").

[51] *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1224 (10th Cir. 2008).

[52] *W. Watersheds Project v. Vilsack*, 696 F. Supp. 3d 1033, 1045 (D. Wyo. 2023) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992)).

[53] *Producers of Renewables United for Integrity Truth & Transparency v. Env't Prot. Agency*, No. 19-9532, 2022 WL 538185, at *4 (10th Cir. Feb. 23, 2022).

[54] *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802, 814 (10th Cir. 2021).

[55] *Santa Fe All. for Pub. Health & Safety*, 993 F.3d at 814.

agencies authorize the taking of Utah prairie dogs;[56] and (2) Friends of Animals did not argue that any of the Master Permits authorized by the GCP harmed the Utah prairie Dogs.[57]

Friends of Animals has plead sufficient allegations to support its members' claim that they were harmed by the GCP. The GCP authorizes the Agency to issue Master Permits to entities, such as cities and counties, which then issue individual Take Permits for development projects. Additionally, the Master Permit Holders will issue Take Permits to developers whose projects are compliant with the GCP.[58] Friends of Animals' members alleged they are injured by the taking of the Utah prairie dog because it harms their ability to enjoy the Utah prairie dog.[59] The ability to observe an animal species is a cognizable interest for the purposes of standing, and Friends of Animals has sufficiently plead an injury in fact because the GCP authorizes the issuance of Take Permits, which will lead to the taking of Utah prairie dogs.[60] Additionally, Friends of Animals' arguments against the Agency and GCP satisfy the "fairly traceable" element of standing because Friends of Animals established that the GCP is a "but-for" cause of the harm it suffered related to the taking of the Utah prairie dog.[61]

### 2.    Friends of Animals challenged a Final Agency Action

The Agency argues Friends of Animals failed to challenge a Final Agency Action by challenging the Agency's GCP. "When a plaintiff seeks review of agency action 'under the

---

[56] Agency Response 11.

[57] Agency Response 11-12

[58] Friends of Animals Reply at 1; Agency Response at 8-9.

[59] Agency Response at 11.

[60] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992) (stating the desire to observe an animal species is a cognizable interest for the purposes of standing).

[61] *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802, 814 (10th Cir. 2021) (stating that a plaintiff can satisfy the "fairly traceable" requirement by advancing allegations which, if proven allow for the conclusion that the challenged conduct was a "but for" cause of the injury); *McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 531 (10th Cir. 2018) (citations omitted) ("[B]ut for cause does not mean sole cause.").

general review provisions of the APA, the 'agency action' in question must be a 'final agency action.' "[62] "The APA defines 'agency action' as an 'agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.' "[63] The burden is on Plaintiff to identify and explain how the agency's conduct is a "final agency action" within the meaning of section 551(13).[64] The Tenth Circuit has held:

> [A]gency action is final if it satisfies two requirements: First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.[65]

"Notably, a final agency action 'mark[s] the end of the road for the agency's consideration of the issue[.]' "[66]

First, the GCP is a final agency action because it is the Agency's published general conservation plan for the Utah prairie dog for three designated locations.[67] The administrative record contains earlier drafts of the GCP, but the final GCP, which is at issue at this lawsuit, lays out the rules for master permits, Take Permits, translocations, habitat restoration, mitigation strategy, and various other issues that pertain to the conservation of the Utah prairie dog. Friends

---

[62] *San Diego Cattlemen's Coop. Ass'n v. Vilsack*, No. CV 14-00818 RB/WPL, 2015 WL 12866993, at *4 (D.N.M. Nov. 3, 2015) (quoting *Lujan*, 497 U.S. at 882)).

[63] *Colorado Farm Bureau Fed's v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) (citing 5 U.S.C. § 551(13)).

[64] *Colorado Farm Bureau Fed'n*, 220 F.3d at 1173 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882, (1990)).

[65] *Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1231 (10th Cir. 2016) (internal quotation marks omitted).

[66] *San Diego Cattlemen's Coop. Assan v. Vilsack*, No. CV 14-00818 RB/WPL, 2015 WL 12866993, at *4 (D.N.M. Nov. 3, 2015) (quoting *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1192 (10th Cir. 2014)).

[67] GCP at FWS_002103.

of Animals is correct that: "Nothing indicates the GCP is of a merely tentative or interlocutory nature."[68]

It is true that the GCP is not the Agency's final consideration of the Utah prairie dog issue for some situations. Specifically, if an applicant wants to obtain a permit for a location where the local government does not have a Master Permit that encompasses the location of the proposed developmental project, then the Agency would have to evaluate the proposal and issue a Take Permit if the proposal meets the terms of the GCP or, otherwise, deny a Take Permit. The fact that the GCP is not the Agency's "final consideration" on every conservation issue for the Utah prairie dog does not mean it is not itself a final agency action. Friends of Animals met its burden in establishing that the GCP was the consummation of the Agency's decision-making process.

Second, the GCP constitutes a final agency action because the GCP sets many parameters for the Agency and others. The GCP outlines the "obligations" of commercial and residential developers within the "permitting area."[69] These obligations are meant to help the Agency achieve its goals to "support continued economic viability in the permitting area while compensating for impacts to Utah prairie dogs as a result of commercial and residential development."[70] Additionally, these obligations help minimize and mitigate the taking of the Utah prairie dog. These obligations under the GCP include: (1) Utah prairie dog translocations,

---

[68] Friends of Animals Reply at 2.

[69] GCP at FWS_002126; *see also* GCP FWS_002111 (defining the term "permitting area" as "any non-Federal land where incidental take is anticipated from the covered activities in the GCP's plan area). Additionally, the "Plan Area" is defined as "the area in which 1) covered activities resulting in incidental take of Utah prairie dogs would occur, 2) translocations onto Federal and protected lands would occur, and 3) habitat would be set aside for protection and management for mitigation purposes under this GCP." GCP at FWS_002111.

[70] GCP at FWS_002124.

(2) habitat and plague management at translocation sites, and (3) protection of the Utah prairie dog habitat.[71]

The GCP also grants and defines the Agency authority to: (1) issue Master Permits to local government agencies and these Master Permits will allow the local government agencies to issue Individual Take Permits to developers;[72] (2) deny Master Permits to local government agencies;[73] (3) suspend Master Permits to local government agencies that do not follow the GCP;[74] (4) revoke Take Permits to developers who do not follow the GCP;[75] and (5) issue Take Permits directly to developers if no local government holds a Master Permit for the location of the developmental project.[76] The GCP is a final agency action because it: (1) list obligations for various entities; and (2) is the Agency's final consideration on the framework for the conservation plan related to the Utah prairie dog.

## B. The GCP will minimize and mitigate the take of the Utah prairie dog to the maximum extent practicable

Friends of Animals argues the GCP violates the Endangered Species Act because the GCP will not minimize and mitigate take to the maximum extent practicable[77] because: (1) the Agency does not have a factual basis for concluding that the mitigation and minimization measures will fully offset take;[78] (2) the mitigation and minimization measures will not fully offset the impacts

---

[71] GCP at FWS_002124.

[72] GCP at FWS_002110.

[73] GCP at FWS_002110.

[74] GCP at FWS_002185

[75] GCP at FWS_002185

[76] GCP at FWS_002110.

[77] The Agency will issue a permit if the applicant meets certain requirements, one of which is: "(ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking[.]" 16 U.S.C.§ 1539(a)(2)(B)(ii).

[78] Friends of Animals Opening Br. at 15-19.

of the take;[79] (3) the Agency's decision to perform translocations "when feasible" makes this mitigation measure unenforceable; and (4) the GCP abandons feasible measures from current and past HCPs and it does not implement additional practicable measures.[80]

The Endangered Species Act states that a Take Permit shall be issued if, among other requirements, the Agency concludes that the applicant's conservation plan will "to the maximum extent practicable, minimize and mitigate the impacts of such taking[.]"[81] The Agency's Incidental Take Permit Processing Handbook has defined to term "maximum extent practicable" to mean: (1) "the HCP applicant demonstrates that the impacts of the taking will be 'fully offset'[82] by the measures incorporated into the plan"; or (2) "the applicant demonstrates that while the HCP will not completely offset the impacts of the taking, the minimization and mitigation measures provided in the plan represent the most the applicant can practicably accomplish."[83] The GCP will minimize and mitigate the taking of the Utah prairie dog to the maximum extent practicable, and Friends of Animals four arguments to the contrary are not persuasive for the reasons specified in Sections (III)(B)(1)-(4).

---

[79] Friends of Animals Opening Br. at 19-22.

[80] Friends of Animals Opening Br. at 26-27.

[81] 16 U.S.C.§ 1539(a)(2)(B)(ii).

[82] The term "fully offset" has been defined to mean: "completely mitigating any impacts expected to remain after avoidance and minimization measures are implemented. In other words, fully offset means the biological value that will be lost from covered activities will be fully replaced through implementation of conservation measures with equivalent biological value. Fully offset also means the mitigation is commensurate (equal) with the impacts of taking." Incidental Take Permit Processing Handbook at FWS_LIT_010066; Friends of Animals Opening Br. at 13-14. Neither party objected to this definition.

[83] Incidental Take Permit Processing Handbook at FWS_LIT_010066; Friends of Animals Opening Br. at 13-14.

**1.    The GCP was not required to specify every facet of its conservation plan before a permit is sought for a development project**

Friends of Animals argues the Agency does not have a factual basis for its conclusion that the GCP will "fully offset" the impacts of take of the Utah prairie dog.[84] Friends of Animals reasons: (1) the Agency must provide a reasonable basis for determining the number of acres needed to fully offset the impacts of habitat loss based on quality and value of land taken and the Agency failed to do so;[85] (2) the Agency merely stated Utah prairie dogs would be translocated without providing any explanation on the quality of the land that was being taken;[86] and (3) the Agency cannot make a determination that the new habitat will be of equal value without knowing the location and quality of the habitat being replaced.[87]

Friends of Animals' argument demonstrates it does not understand the Endangered Species Act's regulatory structure and the GCP. The GCP is an umbrella plan that explains how permits will be awarded for developmental projects that could lead to the taking of the Utah prairie dog. Specifically, after the GCP was finalized, residential and commercial developers provide the relevant Master Permit holder an application for a Take Permit (i.e., incidental take permit).[88] After the application is received, the Master Permit holder can evaluate the minimization and mitigation needs of the project, tailor the mitigation and minimization measures to the specific project, and conduct a habitat quality assessment.[89] It is *impossible* for

---

[84] Friends of Animals Opening Br. at 12, 15.

[85] Friends of Animals Opening Br. at 15-16.

[86] Friends of Animals Opening Br. at 17.

[87] Friends of Animals Opening Br. at 17.

[88] Agency Response at 27-28; GCP at FWS_002276-77 (stating the project proponent would provide the master permit holder a map and description of the proposed project, Utah prairie dog survey results, total acreage of impacts to the Utah prairie dog habitat, a list of the minimization and mitigation measures, and other information).

[89] GCP at FWS_002284-85 (stating a habitat quality assessment would occur for minor development areas and the project proponent could be required to conduct translocations and pay standard fees).

the Agency or Master Permit holder to know the number of acres, quality, and location of the land needed to fully offset the take from the development project *before* the developer provides the application to the Master Permit holder. The Endangered Species Act does not require that the Agency detail the number of acres, quality, or location of the land needed to offset the take when it publishes a conservation plan like the GCP. The Agency did not violate the Endangered Species Act or Administrative Procedure Act by failing to specify the characteristics of the land (i.e., number of acres, quality of land, and location) that would be used for mitigation for future projects when the GCP was adopted.[90]

        **2.**        **The GCP's mitigation and minimization measures did not violate the Endangered Species Act's requirement that the take of the Utah prairie dog is limited to the maximum extent practicable**

Friends of Animals argues the GCP's mitigation and minimization measures are not sufficient to comply with the Endangered Species Act's requirement to limit the taking of the Utah prairie dog to the maximum extent practicable.[91] Friends of Animals reasons: (1) translocations are ineffective;[92] (2) the Agency has no basis for determining that its mitigation and minimization measures will "fully offset" the impacts of take and these measures will not offset the impact of take;[93] and (3) the failure to identify translocation sites makes it nearly

---

[90] Friends of Animals Opening Br. at 15-17; Agency Response at 27-28.

[91] Friends of Animals Opening Br. at 19-22. The Agency's Handbook has defined the term "maximum extent practicable" to mean: (1) "the HCP applicant demonstrates that the impacts of the taking will be "fully offset" by the measures incorporated into the plan"; or (2) "the applicant demonstrates that while the HCP will not completely offset the impacts of the taking, the minimization and mitigation measures provided in the plan represent the most the applicant can practicably accomplish." Incidental Take Permit Processing Handbook at FWS_LIT_010066; Friends of Animals Opening Br. at 13-14. Neither party disputes this definition.

[92] Friends of Animals Opening Br. at 1-2, 19-20.

[93] Friends of Animals Opening Br. at 15, 19.

impossible to assess the impacts of future take of the Utah prairie dog and frustrates Friends of Animals' ability to meaningfully comment on the GCP and Take Permits.[94]

First, Friends of Animals argues the GCP's mitigation and minimization measures will not fully offset take because translocations are ineffective.[95] Friends with Animals notes that less than 10% of prairie dogs survive the first year of translocation and two-thirds of all new translocation sites fail.[96] Friends of Animals argument overlooks: (1) the characteristics of the Utah prairie dogs; and (2) other conservation measures that are in the GCP besides translocations. Specifically, Friends of Animals overlooks the fact that Utah prairie dogs have relatively short lifespans and the vast majority live less than four years.[97] This short lifespan means that a significant percentage of the translocated prairie dogs that do not live beyond the first year would have died of natural causes even if they had not been translocated.[98] Additionally, the goal of translocations is to establish Utah prairie dog colonies on protected land, not to ensure that translocated Utah prairie dogs survive translocation for a set period of time.[99] Moreover, the GCP contains other conservation measures that assist the Agency in offsetting the take of the Utah prairie dog such as: restoration of habitats, conservation banks, land acquisitions, conservation easements, and plague management.[100] The Agency's reliance on

---

[94] Friends of Animals Opening Br. at 18-19 (citing *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002)).

[95] Friends of Animals Opening Br. at 10, 19-20.

[96] Friends of Animals Opening Br. at 19-20.

[97] Agency Response at 19.

[98] Agency Response at 19. A scientific paper in the record concluded that: "Prairie dogs did not live long." Back-Tailed, Gunnison's and Utah Prairie Dogs Reproduce Slowly at FWS_LIT_005986-87. The paper also noted less than 50% of female Utah prairie dogs survived the first year of life. *Id*. The paper also notes that male Utah prairie dogs have a similar lifespan to the female Utah prairie dogs. *Id*.

[99] *See* Agency Response at 18.

[100] GCP at FWS_002126-27.

translocations as a minimization measure does not violate the Endangered Species Act's requirement that the take of the Utah prairie dog be limited to the maximum extent practicable.

Second, Friends of Animals argues the Agency has no basis for concluding that its mitigation and minimization measures will fully offset the impacts of take.[101] Specifically, Friends of Animals objects to the Agency's "mitigation ratio," and it argues the 2:1 ratio is too low.[102] "Mitigation ratio" is defined as the "ratio of acres of habitat conserved to the acres of habitat impacted."[103] Friends of Animals argues the Agency's decision to set the minimum mitigation ratio at 2:1 was arbitrary and capricious because it entirely failed to consider the low success rate of translocations, lag-time, restoration uncertainties, and an earlier draft of the GCP concluded a 3:1 ratio was necessary to offset the loss of impacted habitats.[104]

Friends of Animals has failed to establish that the Agency's 2:1 mitigation ratio was arbitrary and capricious. For an arbitrary and capricious review "[t]he Court determines 'only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.' "[105] The GCP states that a greater than 1:1 ratio was necessary to offset temporal losses, lag time, and habitat quality loss from habitat already occupied by the Utah prairie dog.[106] Additionally, the Agency noted that the 2:1 mitigation ratio is merely a minimum ratio and that it could set a

---

[101] Friends of Animals at 19-20.

[102] Friends of Animals at 19-20.

[103] GCP at FWS_002135.

[104] Friends of Animals at 20 (citing GCP at FWS_002135).

[105] *W. Watersheds Project v. Vilsack*, 696 F. Supp. 3d 1033, 1041 (D. Wyo. 2023) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019)).

[106] GCP at FWS_002135.

higher mitigation ratio if a situation called for a higher mitigation ratio.[107] Friends of Animals failed to establish that the Agency's decision to conserve twice the number of acres that is impacted as part of its conservation plan was arbitrary and capricious.

Third, Friends of Animals argues that the GCP's failure to identify the mitigation sites also violates the Endangered Species Act.[108] Friends of Animals reasons that: (1) the Agency is required to establish a refuge before it permits the adverse modification of a habitat and the Agency failed to do so here;[109] and (2) the Agency deprived Friends of Animals of a meaningful opportunity to publicly comment on the GCP by failing to identify the mitigation site and the D.C. Circuit previously held that an environmental group did not have a meaningful opportunity to comment on the mitigation value of the site because the Agency did not disclose the site's location.[110] Both of these arguments lack merit. The Agency did not breach the Endangered Species Act by failing to specify every mitigation site in the GCP. The GCP is an umbrella plan, and the GCP is not specifically authorizing any take or issuing Take Permits for a development project. Under the GCP, the Master Permit Holder will be able to specify the conservation site after the commercial or residential developer submits their application for a Take Permit. The Agency's failure to specify every conservation site for every development project that will occur in the future was not arbitrary and capricious. The conservation sites will be specified after the applications are submitted.

---

[107] GCP at FWS_002135. The Agency employed a 1:1 conservation ratio for lower quality habitat, and a 2:1 conservation ratio for higher quality habitat. Agency Response at 20.

[108] Friends of Animals at 18-19 (citing *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002)).

[109] Friends of Animals at 18-19 (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987)).

[110] Friends of Animals at 18-19 (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987)).

The Agency also did not deprive Friends of Animals to meaningful public comment on the GCP. Friends of Animals lawsuit is materially distinguishable from *Gerber v. Norton*.[111] In *Gerber v. Norton*: (1) the developer submitted an application to an agency for a permit because its project would lead to the taking of a protected species; (2) the application stated a 31-acre forested parcel would be conserved to off-set the taking of the protected species; and (3) the application did not list the location of the 31-acre forested parcel.[112] The D.C. Circuit's opinion in *Gerber* is distinguishable from Friends of Animals' lawsuit because Friends of Animals is challenging a different type of final agency action. In *Gerber*, the Agency approved a specific project, and the Agency concluded the project would likely lead to the taking of a protected species.[113] In contrast, Friends of Animals' lawsuit is challenging the GCP, which is an umbrella plan that explains the requirements for Master Permit holders to award Take Permits. In other words, the GCP does not approve a specific development project that will lead to the taking of an endangered species, and Friends of Animals is not challenging a specific Take Permit that was issued by the Agency. Friends of Animals was not deprived a meaningful opportunity to comment on the GCP or on future Take Permits.[114]

### 3. The GCP's "when feasible" limitation for translocations does not violate the Endangered Species Act

Friends of Animals argues the GCP's limitation for translocations "when feasible" is not enforceable and will not offset take to the maximum extent practicable.[115] Friends of Animals

---

[111] *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002).

[112] *Gerber*, 294 F.3d at 177.

[113] *Gerber*, 294 F.3d at 176.

[114] It is important to note that Friends of Animals is challenging the GCP and the Take Permits that will be issued in the future pursuant to the GCP. In other words, Friends of Animals is not challenging a *specific* Take Permit that was issued pursuant to the GCP and an application from a developer for a development project.

[115] Friends of Animals at 24-25. The Agency's Handbook has defined to term "maximum extent practicable" to mean: (1) "the HCP applicant demonstrates that the impacts of the taking will be 'fully offset' by the measures

reasons translocations are only feasible if: (1) the developer determines it is convenient to

schedule the project within the translocation season; or (2) the project's schedule is known in

advance and the developer determines translocation is consistent with their schedule and can

occur in the translocation season prior to the development.[116] Friends of Animals also notes

translocation season generally lasts only two months, from July 1st to August 31st.[117] Friends of

Animals concludes:

> Translocations when "feasible," as defined by the GCP, are not mandatory or
> enforceable and will not fully offset or minimize the impacts to the maximum
> extent practicable because developers can avoid translocations if they develop
> outside prairie dog translocation season, if no translocation sites are available, or
> if the Utah Division of Wildlife Resources does not have funding to perform
> translocations.[118]

Friends of Animals failed to establish that the GCP's "when feasible" limitation for

translocations violates the Endangered Species Act. Translocations are merely one of several

conservation measures the Agency employs to ensure the take of the Utah prairie dog is limited

to the maximum extent practicable. The Agency also restores and enhances habitat, manages

plague at translocation sites, utilizes land conservation, land acquisitions, and conservation

easements.

Friends of Animals' argument also overlooks characteristics of the Utah prairie dog and

the Agency's conservation plan. The Agency adopted a short window for translocation season

(i.e., July 1st to August 31st) because juvenile and lactating female prairie dogs suffered a high

---

incorporated into the plan"; or (2) "the applicant demonstrates that while the HCP will not completely offset the impacts of the taking, the minimization and mitigation measures provided in the plan represent the most the applicant can practicably accomplish." Incidental Take Permit Processing Handbook at FWS_LIT_010066.

[116] Friends of Animals at 24; *see also* GCP at FWS_002095.

[117] Friends of Animals at 24.

[118] Friends of Animals Brief at 24-25.

mortality rate if they are translocated before July 1st.[119] The GCP also states that the

translocation season may be extended for health and safety issues.[120] Additionally, the statistics

in the record suggest the short translocation season has not prevented the Agency from

transporting a large number of Utah prairie dogs.[121] Furthermore, the Administrative Record

establishes that the Agency's conservation methods have led to an increase of the Utah prairie

dog population from 13,435 in 1976 to the most recent population estimate in 2018 of 73,562.[122]

The Agency's "when feasible" limitation for translocations does not violate the Endangered

Species Act.

> **4.     The GCP's omission of mitigation and minimization measures from past HCPs and other conservation measures does not prevent the GCP from offsetting take of the Utah prairie dog to the maximum extent practicable**

Friends of Animals argues the GCP will not mitigate or minimize take to the maximum

extent practicable because the GCP abandons mitigation and minimization measures from past

HCPs and it does not implement additional practicable measures.[123] Friends of Animals reasons:

(1) the fact that counties in Utah have implemented these measures in the past demonstrates that

---

[119] U.S. Fish and Wildlife Service, Recommended Translocation Procedures for Utah Prairie Dog, at 8 (September 2009), https://www.fws.gov/sites/default/files/documents/utah-prairie-dog-recommended-translocation-procedures-2009.pdf ("Juvenile and lactating females suffered an immediate high mortality (juveniles 100%; adult females 72%) when translocated before July, most likely due to loss of energy reserves.").

[120] GCP at FWS_002139; GCP at FWS_002162.

[121] An average of 786 prairie dogs were translocated per year from 1972-2016, and an average of 1,924 prairie dogs were translocated from 2012-2016. GCP at FWS_002162.

[122] Dep't of Interior Memorandum at FWS_001660 (stating the most recent 5-year average range-wide population was 73,562); Agency's Response at 24 (stating the spring count of the Utah prairie dog was 1,866 in 1976, which means that the estimated population was 13,435). The spring count is multiplied by 7.2 to determine an estimated population. GCP at FWS_002098-99 ("Spring counts in these tables were converted to total population estimates by multiplying by 7.2[.]"). According to Friends of Animals briefing the 2016 spring count was 11,484, which mean the estimated population was 82,684.8 in the Southwest corner of Utah. Friends of Animals Opening Br. at 4.

[123] Friends of Animals Opening Br. at 26.

the agency can feasibly do more to offset take;[124] and (2) the Agency failed to adopt other minimization and mitigation techniques such as limiting the areas and amounts of prairie dogs that could be taken, preserving high-quality habitat, and seasonal restrictions on takings.[125]

Friends of Animals misunderstands the requirements of the Endangered Species Act. The Agency is obligated to issue a permit if the permit applicant's conservation plan, among other things, minimizes and mitigate take to the "maximum extent practicable."[126] The term "maximum extent practicable" has been defined by the Agency to mean: (1) "the HCP applicant demonstrates that the impacts of the taking will be 'fully offset' by the measures incorporated into the plan";[127] or (2) "the applicant demonstrates that while the HCP will not completely offset the impacts of the taking, the minimization and mitigation measures provided in the plan represent the most the applicant can practicably accomplish."[128] Friends of Animals does not challenge these definitions in its briefing or reference these significant definitions in its argument.[129]

Furthermore, if the applicant's conservation plan "fully offsets" the impacts of the take, as the Agency alleges, then the Agency is required to issue a permit even if the Plan omits other conservation techniques.[130] Friends of Animals does not cite to any statutory or regulatory

---

[124] Friends of Animals Opening Br. at 26.

[125] Friends of Animals Opening Br. at 26-27.

[126] 16 U.S.C.§ 1539(a)(2)(B)(ii); GCP at FWS_002106.

[127] The term "fully offset" has been defined to mean: "completely mitigating any impacts expected to remain after avoidance and minimization measures are implemented. In other words, fully offset means the biological value that will be lost from covered activities will be fully replaced through implementation of conservation measures with equivalent biological value. Fully offset also means the mitigation is commensurate (equal) with the impacts of taking." Incidental Take Permit Processing Handbook at FWS_LIT_010066; Friends of Animals Opening Br. at 13-14. Neither party objects to this definition.

[128] Incidental Take Permit Processing Handbook at FWS_LIT_010066.

[129] Friends of Animals Opening Br. at 26-27.

[130] The Agency is required to issue the permit as long as the applicant's plan minimizes and mitigates the taking to the maximum extent practicable *and* the other statutory requirements are met. 16 U.S.C. § 1539(a)(2)(B)(i)-(v).

authority that requires the Agency adopt conservation techniques from previous HCPs or other conservation techniques that may reduce the take of Utah prairie dogs.[131] To put it differently, it does not matter that the applicant "can feasibly do more to offset take" of the Utah prairie dog. Instead, what matters is that the GCP establishes a framework that enables permit applicants to submit applications that limit the taking of the Utah prairie dog to the "maximum extent practicable" as defined by the Agency.[132]

Friends of Animals argues, in its concluding sentence for this argument, that the Agency was required to consider Friends of Animals' additional proposed conservation measures because the Agency failed to establish that its conservation measures will "fully offset" the taking of the Utah prairie dog.[133] In other words, it appears Friends of Animals is trying to argue that because the Agency failed to meet the first definition for the term "maximum extent practicable" that requires the taking be "fully offset," the Agency is required to evaluate additional conservation measures and explain why these measures are not practicable.[134] This decision will not conclude that the second definition for the term "maximum extent practicable" requires an evaluation of other conservation measures that Friends of Animals proposed. Additionally, as noted in Section (III)(B)(2) of this opinion, Friends of Animals failed to establish that the Agency's conclusion that the GCP would "fully offset" the taking of the Utah prairie dog was arbitrary and capricious. For this reason, the Agency's decision to not evaluate

---

[131] Friends of Animals Opening Br. at 26-27.

[132] Friends of Animals Opening Br. at 26-27.

[133] Friends of Animals Opening Br. at 27.

[134] Friends of Animals Opening Br. at 27. The Agency's Handbook has defined to term "maximum extent practicable" to mean: (1) "the HCP applicant demonstrates that the impacts of the taking will be 'fully offset' by the measures incorporated into the plan"; or (2) "the applicant demonstrates that while the HCP will not completely offset the impacts of the taking, the minimization and mitigation measures provided in the plan represent the most the applicant can practicably accomplish." Incidental Take Permit Processing Handbook at FWS_LIT_010066.

these additional conservation measures was not arbitrary and capricious, and the Agency did not violate the Endangered Species Act by failing to consider these additional conservation measures.

### C.  The Agency was not required to consider alternatives to the GCP under the Endangered Species Act's subsections (a)(2)(A)(ii)-(iii)

Friends of Animals argues the Agency failed to consider alternatives to the GCP.[135] Friends of Animals reasons: (1) The Endangered Species Act requires applicants that want a Take Permit to submit an HCP that explains the alternative actions to such taking the applicant considered and reasons why such alternatives were not utilized;[136] (2) the alternatives offered by the applicant should be meaningful with a focus on significant differences in project design that would avoid or reduce take;[137] (3) the Agency only considered two additional GCP alternatives which were a seasonal timing incentive and no action;[138] (4) these two alternatives are not meaningful and they do not reduce take;[139] and (5) Friends of Animals suggested various alternatives during the notice and comment period, but the Agency did not consider these alternatives.[140] In response, the Agency argues the Endangered Species Act merely requires the Agency's HCP to specify "what alternative actions to such taking the applicant considered."[141]

---

[135] Friends of Animals Opening Br. at 27 ("[The Agency] failed to consider GCP alternatives that avoid or reduce the take of Utah prairie dogs.").

[136] Friends of Animals Opening Br. at 27 (citing 16 U.S.C. § 1539(a)(2)(A)(ii)-(iii)).

[137] Friends of Animals Opening Br. at 27 (citing Incidental Take Permit Processing Handbook FWS_LIT_009998).

[138] Friends of Animals Opening Br. at 28.

[139] Friends of Animals Opening Br. at 28.

[140] Friends of Animals Opening Br. at 28-29. Specifically, Friends of Animals suggested: "(1) seasonal restrictions on development; (2) implementation of practicable measures identified in previous HCPs; (3) protection of crucial habitat, colonies, and connective corridors; and/or (4) having an enforceable limit on the amount of take." Friends of Animals at 28.

[141] Agency Response at 34 (citing 16 U.S.C. § 1539(a)(2)(A)(iii)).

The Agency reasons it did not violate the Endangered Species Act because it discussed alternative actions.[142]

The Agency and Friends of Animals misunderstand the obligations articulated in 16 U.S.C. § 1539(a)(2)(A)(ii)-(iii).[143] These provisions state:

> No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a conservation plan that specifies . . . (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized[.][144]

These statutory provisions state that the applicant for a Take Permit must explain to the Master Permit Holder: (1) the steps the applicant will take to minimize and mitigate the take and the funding to implement these steps; and (2) the alternative actions to the development plan that will result in a taking of the Utah prairie dog and why these alternative actions were not taken. These statutory provisions do not impose obligations on the Agency, and Friends of Animals' arguments to the contrary are mistaken.[145]

### D.  The Agency's conclusion that the take associated with the GCP would not jeopardize the continued existence of the Utah prairie dog was not arbitrary and capricious

Friends of Animals argued that the Agency failed to establish that the take associated with the GCP would not reduce the likelihood of survival of the Utah prairied dog.[146] Friends of

---

[142] Agency Response at 35 (citing GCP at FWS_002176-79).

[143] Friends of Animals at 27 (citing 16 U.S.C. § 1539(a)(2)(A)(ii)-(iii)); Agency Response at 34 (citing 16 U.S.C. § 1539(a)(2)(A)(ii)-(iii)).

[144] 16 U.S.C. § 1539(a)(2)(A)(ii)-(iii) (emphasis added).

[145] Friends of Animals Opening Br. at 27-29 ("[The Agency] failed to consider GCP alternatives that avoid or reduce the take of Utah prairie dogs. . . . [the Agency] failure to consider any meaningful alternatives that would avoid or reduce take violates the ESA requirements and is thus unlawful under the APA.").

[146] Friends of Animals Opening Br. at 29 (citing Section 10(a)(2)); 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1539(a)(B)(iv)). Jeopardy to the continued existence of a listed species means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and

Animals reasons: (1) the Agency's own calculations estimates that 17% of the Utah prairie dog population could be taken each year under the GCP;[147] (2) the Agency ignored a relevant study and misapplied another study;[148] (3) the Agency failed to consider how the loss of important habitat could impact the Utah prairie dog;[149] (4) the Agency failed to identify the location of the habitat that would be lost;[150] and (5) the Agency only used data that supported its decision.[151]

In response, the Agency argues: (1) the GCP and Master Permits will fully offset take to the maximum extent practicable;[152] and (2) the administrative record supports the Agency's no jeopardy finding.[153] The Agency reasons these conclusions are supported by: (1) the Agency's four-decade-long history of working with Utah state agencies on translocations and conservation for the Utah prairie dog;[154] (2) the Agency's adaptive management strategies that maximize flexibility for its conservation plan;[155] (3) the Agency's scientific expertise, which is entitled to deference;[156] (4) the Agency and one Utah state agency translocated 23,359 Utah prairie dogs from private to public lands;[157] and (5) the Agency's translocation effort resulted in an 11-fold

---

recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. Section 402.02.

[147] Friends of Animals Opening Br. at 30.

[148] Friends of Animals Opening Br. at 31-32 (citing Shooting Prairie Dogs at FWS_LIT_007060; Dep't of Interior Memorandum at FWS_001685).

[149] Friends of Animals Opening Br. at 32 (citing Dep't of Interior Memorandum at FWS_001676).

[150] Friends of Animals Opening Br. at 34-35 (citing Final Revised Recovery Plan at FWS_LIT_009606).

[151] Friends of Animals Opening Br. at 35-36.

[152] Agency Response at 15-24.

[153] Agency Response at 24-31.

[154] Agency Response at 15-16, 24-25.

[155] Agency Response at 16.

[156] Agency Response at 16-17.

[157] Agency Response at 17.

increase in the Utah prairie dog population at one site.[158] Additionally, the Agency argues Friends of Animals repeatedly overstates the likely amount of take.[159]

"The interpretations and opinions of the relevant agency, made in pursuance of official duty and based upon specialized experience, constituted a body of experience and informed judgment to which courts and litigants *could* properly resort for guidance, even on legal questions."[160] "The weight of such a judgment in a particular case . . . would depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[161]

The facts in the Administrative Record and GCP support the Agency's conclusion that the GCP will not appreciably reduce the likelihood of the survival and recovery of the Utah prairie dog in the wild. The analysis was not arbitrary and capricious.[162] The Agency has a four-decade-long relationship with Utah's wildlife agencies. Additionally, through the agencies' conservation efforts, the Utah prairie dog population increased from an estimated population of 13,435 in 1976 to the most recent population estimate in 2018 of 73,562.[163] The Agency made its

---

[158] Agency Response at 17; Final Revised Recovery Plan at FWS_LIT_009592.

[159] Agency Response at 19.

[160] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (alterations omitted) (internal quotation marks omitted) (emphasis added) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[161] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (internal quotation marks omitted) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[162] Agency Response at 24.

[163] Agency Response at 25; Dep't of Interior Memorandum (FWS_001660) (stating the most recent 5-year average range-wide population was 73,562); Agency's Response at 24 (stating the spring count of the Utah prairie dog was 1,866 in 1976, which means that the estimated population was 13,435). The spring count is multiplied by 7.2 to determine an estimated population. GCP at FWS_002098-99 ("Spring counts in these tables were converted to total population estimates by multiplying by 7.2[.]"). According to Friends of Animals' briefing the 2016 spring count was 11,484, which mean the estimated population was 82,684.8 in the Southwest corner of Utah. Friends of Animals Opening Br. at 4.

conclusion that the GCP would not jeopardize the existence of the Utah prairie dog population

because: (1) most of the take would be limited to major development areas, which do not support

the long-term recovery of the Utah prairie dog;[164] (2) impacts from the loss of colonies in major

development areas will be fully offset by the establishment or re-establishment of colonies on

federal or protected lands;[165] and (3) the impacts from the loss of larger sized colonies or higher

quality habitats in the minor development areas would be fully offset by the protection of other

colonies.[166] The Agency's thoroughness in its conservation plan, expertise in the field, and

history of success supports the Agency's conclusion that the GCP will not jeopardize the

continued existence of the Utah prairie dog, and this conclusion was not arbitrary and capricious.

### E.  The Agency's conclusion that there was adequate funding for the GCP was not arbitrary and capricious

Friends of Animals argues that the Agency failed to ensure the GCP was adequately

funded.[167] Friends of Animals reasons: (1) the implementation agreement admits applicants will

only provide funding "as available," and the agreement did not ensure adequate funding;[168] (2)

the GCP's funding estimate erroneously assumes the state of Utah will carry out prairie dog

conservation programs, but fails to identify funding for those programs;[169] (3) the GCP fails to

identify lands to carry out the mitigation and minimization, or funding to purchase new lands;[170]

(4) there is no evidence the state of Utah will have sufficient funds for mitigation and

---

[164] Agency Response at 25 (citing GCP at FWS_001752).

[165] Agency Response at 25 (citing GCP at FWS_001752).

[166] Agency Response at 25 (citing GCP at FWS_001752).

[167] Friends of Animals Opening Br. at 37.

[168] Friends of Animals Opening Br. at 37 (citing Implementation Agreement at FWS_001909).

[169] Friends of Animals Opening Br. at 37.

[170] Friends of Animals Opening Br. at 37.

minimization measures in major development areas;[171] and (5) the Agency failed to ensure adequate funding to mitigate habitat loss in minor development areas.[172]

Friends of Animals erred in its reasoning for this argument. First, Friends of Animals erred in its assertion that the Implementation Agreement states: "Applicants will only provide funding as available."[173] In reality, the Implementation Agreement states the Utah Division of Wildlife and Utah Division of Wildlife Resources will provide funding "as available" for translocations.[174] These Utah agencies are not applicants for Take Permits. Second, Friends of Animals argues that the absence of a specific appropriation by the federal or a state government "is sufficient to set aside the HCP."[175] Friends of Animals is mistaken because there is no statutory basis that requires a specific government appropriation for the GCP or an applicant's HCP. Instead, the Endangered Species Act only requires "that adequate funding for the plan *will be* provided."[176] Friends of Animals does not cite to any regulation or statute that supports its position that a federal or state appropriation is required for the GCP or HCP to comply with the Endangered Species Act.[177] Third, the Agency was not required to identify the lands that will be used for mitigation and minimization before a specific permit application is filed by a developer.

The Agency's conclusion that there would be adequate funding for the GCP was not arbitrary and capricious. The Endangered Species Act entrusts the Agency[178] with determining

---

[171] Friends of Animals Opening Br. at 38.

[172] Friends of Animals Opening Br. at 40-41.

[173] Friends of Animals Opening Br. at 37 (citing Implementation Agreement at FWS_001909).

[174] Implementation Agreement at FWS_001909.

[175] Friends of Animals Opening Br at 37.

[176] 16 U.S.C. § 1539(a)(2)(B)(iii) (emphasis added); *see also* 16 U.S.C. § 1539(a)(2)(A)(ii).

[177] The Agency argues that the Court should reject Friends of Animals "scattershot and undeveloped allegations." Agency Response at 30. The Agency's characterization of this argument is correct.

[178] The Endangered Species Act references the Secretary of Interior. The Agency is a federal agency within the Department of Interior.

whether the applicant has adequately ensured funding to mitigate and minimize measures specified in the GCP.[179] The Administrative Record establishes that: (1) the state of Utah's administrative agencies (i.e., Utah Division of Wildlife Services and Utah Division of Wildlife Resources) supported prairie dog conservation, translocations, vegetation enhancement, plague abatement, search and monitoring projects for nearly four decades;[180] (2) Utah's annual average contributions to recovery efforts have exceeded $340,000 for the past sixteen years;[181] (3) the estimate cost of mitigation projects in major development areas was $157,434;[182] (4) the Agency will require permit applicants to pay fees for development projects;[183] (5) the Agency can require an adjustment for the permit fees if there is a reduction in state funding or unforeseen costs;[184] and (6) Friends of Animals mischaracterizes cost projections for various mitigation measures.[185] Friends of Animals failed to establish that the Agency's conclusion of adequate funding for the GCP was arbitrary and capricious.

---

[179] The Endangered Species Act states: "If the Secretary finds, after opportunity for public comment, with respect to a permit application and the related conservation plan that . . . (iii) the applicant will ensure that adequate funding for the plan will be provided. . . and he has received such other assurances as he may require that the plan will be implemented, the Secretary shall issue the permit." 16 U.S.C. § 1539(2)(B)(iii).

[180] Agency Response at 30-31.

[181] Agency Response at 31.

[182] Agency Response at 31.

[183] Agency Response at 23, 31.

[184] Agency Response at 31 (citing Implementation Agreement at FWS_001914).

[185] Specifically, Friends of Animals argues: (1) funding from the State of Utah is not guaranteed; (2) annual translocations costs amount to more than the state's annual funding; (3) revisiting the standard fee every three years might not be frequent enough to make proper adjustments; and (4) the GCP does not account for inflation. Friends of Animals Opening Br. at 28, 34, 38, 41-42; Agency Response at 30-34. Friends of Animals' arguments lack merit because: (1) the state of Utah has provided an average funding of $340,000 for the last 16 years; (2) the fees obtained from Take Permits will also be used for the mitigation and minimization plan; (3) revisiting the fee amount for Take Permits every three years was not arbitrary and capricious; and (4) Friends of Animals' argument that the GCP did not account for inflation is underdeveloped and waived.

### F. The Agency's decision to issue the GCP did not violate the National Environmental Policy Act

Friends of Animals argues that the Agency violated the National Environmental Policy Act by: (1) wrongly concluding that the approval of the GCP and Take Permits would not significantly affect the quality of the human environment;[186] (2) failing to consider other reasonable alternatives to the issuance of the GCP;[187] and (3) failing to provide a reasonable discussion of the proposed mitigation measures to reduce the impact of take of Utah prairie dogs.[188] In response, the Agency argues: (1) the Agency was not required to prepare an environmental impact statement;[189] (2) Friends of Animals fails to demonstrate that the Agency did not consider a reasonable range of alternatives;[190] and (3) the Agency discussed mitigation measures.[191]

### 1. The Agency's conclusion that the GCP would not significantly affect the quality of the human environment was not arbitrary and capricious

When an agency plans to undertake a federal action that *significantly* affects the quality of the human environment, it must prepare a detailed Environmental Impact Statement.[192] Whether an agency action is "significant" enough to require preparation of an Environmental

---

[186] Friends of Animals Opening Br. at 43; *see* 42 U.S.C. § 4332(2)(C).

[187] Friends of Animals Opening Br. at 45 (citing 42 U.S.C. § 4332(2)(C)(ii); 40 C.F.R. § 1502.14).  Friends of Animals the Agency failed to consider: (1) seasonal restrictions on development; (2) implementation of practicable measures identified in previous HCPs; (3) protection of crucial habitat, colonies, and connective corridors; and/or (4) having an enforceable limit on the amount of take. Friends of Animals at 45-46.

[188] Friends of Animals Opening Br. at 46.

[189] Agency Response at 37.

[190] Agency Response at 42-43.

[191] Agency Response at 42, 47 (citing 40 C.F.R. § 1502.14(f)).

[192] Friends of Animals at 42 (emphasis added); 42 U.S.C. § 4332(2)(C)(i)-(iii) (An Environmental Impact Statement includes: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action.").

Impact Statement requires "considerations of both context and intensity."[193] The Regulation defines "context" as:

> the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.[194]

The "intensity" of an action refers to the "severity of impact," and the Agency should consider beneficial and adverse impacts,[195] the degree to which the proposed action affects public health and safety,[196] characteristics of geographic area,[197] the degree the action is likely to be highly controversial,[198] the degree the action is uncertain or involves unknown risks,[199] and some other considerations.[200]

Friends of Animals argues the Agency erred by concluding the GCP and Take Permits would not significantly affect the quality of the human environment because: (1) the conservation of the Utah prairie dog is a highly controversial issue that has been subject to litigation since 2015;[201] (2) of the GCP's intensity, which was caused by its controversial impacts and unknown risks;[202] (3) of the harm the GCP causes Utah prairie dog, which is a

---

[193] 40 C.F.R. § 1508.27(a)-(b); https://www.govinfo.gov/content/pkg/CFR-2012-title40-vol34/pdf/CFR-2012-title40-vol34-sec1508-27.pdf.

[194] 40 C.F.R. § 1508.27(a).

[195] 40 C.F.R. § 1508.27(b)(1).

[196] 40 C.F.R. § 1508.27(b)(2).

[197] 40 C.F.R. § 1508.27(b)(3).

[198] 40 C.F.R. § 1508.27(b)(4).

[199] 40 C.F.R. § 1508.27(b)(5).

[200] The other considerations include: (6) the precedent the action will make, (7) cumulative impacts, (8) adverse effects on historical sites, (9) the affect the action will have on endangered or threatened species and their habitat, and (10) whether the action threatens federal or local laws. 40 C.F.R. § 1508.27(b)(6)-(10).

[201] Friends of Animals Opening Br. at 44.

[202] Friends of Animals Opening Br. at 44.

protected species;[203] and (4) the GCP covers important cultural, historical and archaeological sites.[204] The Agency argues its conclusion that the GCP and Take Permits would not significantly affect the human environment was not arbitrary and capricious because: (1) the context and intensity support the Agency's finding;[205] (2) ongoing litigation regarding the GCP does not mean the GCP has a significant affect on the human environment, and Friends of Animals does not cite any authority to support its position;[206] and (3) "there was no data presented to support claims that the Preferred Action would jeopardize the species or would otherwise have significant impacts for the species."[207]

The Agency's conclusion that the GCP would not significantly affect the quality of the human environment was not arbitrary and capricious. First, the GCP will not jeopardize the Utah prairie dog population. The Administrative Record establishes that the Agency's four-decade-long relationship with Utah state agencies and its conservation methods have led to an increase of the Utah prairie dog population from 13,435 in 1976 to the most recent population estimate in 2018 of 73,562.[208] Moreover, the GCP states that two acres of habitat will be conserved for every one acre of higher quality habitat that is impacted by the project.[209] Additionally, most of the

---

[203] Friends of Animals Opening Br.at 45.

[204] Friends of Animals Opening Br. at 45.

[205] Agency's Response at 38-39.

[206] Agency's Response at 39-40.

[207] Agency's Response at 40.

[208] Dep't of Interior Memorandum at FWS_001660 (stating the most recent 5-year average range wide population was 73,562); Agency's Response at 24 (stating the spring count of the Utah prairie dog was 1,866 in 1976, which means that the estimated population was 13,435). The spring count is multiplied by 7.2 to determine an estimated population. GCP at FWS_002098-99. According to Friends of Animals' briefing the 2016 spring count was 11,484, which mean the estimated population was 82,684.8 in the Southwest corner of Utah. Friends of Animals Opening Br. at 4.

[209] GCP at FWS_002135; The Agency employed a 1:1 conservation ratio for lower-quality habitat, and a 2:1 conservation ratio for higher-quality habitat. Agency Response at 20.

taking will be limited to areas that do not support long-term recovery of the Utah prairie dogs, and the impacts of the GCP will be fully offset by the plan's conservation methods.[210]

Second, Friends of Animals does not cite to any legal authority to support its proposition that *ongoing litigation* establishes the agency action in question *significantly* affects the quality of the human environment.[211] Third, Friends of Animals does not explain why the geographical areas covered by the GCP are culturally or historically significant enough to support a conclusion that the GCP significantly affects the quality of the human environment.[212] The Agency's decision was not arbitrary and capricious because the context and intensity of the GCP establish that the GCP did not significantly affect the human environment.

### 2. Friends of Animals did not establish the Agency failed to consider a reasonable range of alternatives to the GCP

The National Environmental Policy Act states agencies shall in every report on major federal action significantly affecting the quality of the human environment, issue a detailed statement on "(iii) a reasonable range of alternatives to the proposed agency action[.]"[213] Friends of Animals argues the Agency failed to consider reasonable alternatives to the issuance of the GCP, such as: (1) seasonal restrictions on development; (2) implementation of practicable measures identified in previous HCPs; (3) protection of crucial habitat, colonies, and connective corridors; and/or (4) having an enforceable limit on the amount of take.[214] In response, the

---

[210] Agency Response at 25-26 (citing GCP at FWS_001752).

[211] Friends of Animals Opening Br. at 44.

[212] Friends of Animals Opening Br. at 45 (citing Finding of No Significant Impact for the Environmental Assessment of the Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Areas at FWS_002012-13).

[213] 42 U.S.C. § 4332(2)(C)(iii).

[214] Friends of Animals Opening Br. at 45-46.

Agency argues it is not required to analyze alternatives to the GCP that it reasonably determines are impracticable.[215]

In Section (III)(F)(1), this order already determined that the GCP will not significantly affect the quality of the human environment, which is the requirement necessary to trigger the National Environmental Policy Act's § 4332(C)(iii) requirement to discuss a reasonable range of alternatives to the proposed agency action.[216] Even though the Agency was not required to discuss a reasonable range of alternatives to the GCP, it did discuss two alternatives in its Environmental Assessment.[217] Furthermore, as specified below, Friends of Animals' proposed alternative actions were unreasonable.

The Agency adopted the GCP because it balanced the need for economic development within the local community while ensuring the strategic conservation of the Utah prairie dog.[218] The Agency argued that the Friends of Animals' proposed alternatives to the GCP were not reasonable. Specifically, the Agency argued: (1) Friends of Animals' proposed seasonal restriction is unreasonable because it would ban take for 25% of the time, during an unspecified season, and Friends of Animals did not explain why this is reasonable;[219] (2) the proposal to add practical measures from past HCPs is vague and unreasonable because Friends of Animals does

---

[215] Friends of Animals Opening Br. at 45.

[216] 42 U.S.C. § 4332(C)(iii) (All agencies shall "include in every recommendation or report on proposals for legislation and other major Federal actions *significantly affecting the quality of the human environment*, a detailed statement by the responsible official on . . . a reasonable range of alternatives to the proposed agency action[.]") (emphasis added).

[217] Finding of No Significant Impact for the Environmental Assessment of the Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Areas at FWS_001991.

[218] Agency Response at 45 (citing Finding of No Significant Impact for the Environmental Assessment of the Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Areas at FWS_001978).

[219] Agency Response at 46; Friends of Animals Opening Br. at 45 (citing Draft Range-Wide General Conservation Plan for Utah Prairie Dogs at FWS_001238).

not identify which supposed measures would have been a reasonable alternative from past HCPs;[220] and (3) the proposals for protection of "crucial habitat" and an enforceable limit on the amount of take are vague and unreasonable.[221]

Friends of Animals' proposals are vague and unreasonable because they did not explain which measures from past HCPs the Agency should adopt; define the term "crucial habitat;" quantify the degree take should be limited; or explain how the amount of take would be determined.[222] Additionally, the Agency Environmental Assessment contains two alternatives to the Agency's action, which were: (1) Individual County-Wide HCPs and (2) No Action.[223] The Agency reasonably concluded that county-wide HCPs would require significantly more time and resources to process individual HCPs for each county.[224] Additionally, the Agency reasonably concluded that the "No Action" alternative was inferior to the GCP because it would require project proponents to create their own HCP until each Master Permit holder created their own HCP for the Master Permit holder's geographic area.[225] Friends of Animals failed to establish that the Agency did not consider a reasonable range of alternatives.

### 3.    The Agency discussed mitigation measures

Friends of Animals argues the Agency failed to provide a reasonable discussion of the proposed mitigation measures to reduce the impact of the take of Utah prairie dogs, and the

---

[220] Friends of Animals Opening Br. at 46; Agency Response at 46.

[221] Friends of Animals Opening Br. at 46; (citing Draft Range-Wide General Conservation Plan for Utah Prairie Dogs at FWS_001238); Agency Response at 46-47.

[222] Friends of Animals at 46; (citing Draft Range-Wide General Conservation Plan for Utah Prairie Dogs at FWS_001238); Agency Response at 46-47.

[223] Finding of No Significant Impact for the Environmental Assessment of the Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Areas at FWS_001991.

[224] Finding of No Significant Impact for the Environmental Assessment of the Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Areas at FWS_001991.

[225] Finding of No Significant Impact for the Environmental Assessment of the Range-Wide General Conservation Plan for the Utah Prairie Dog in Residential and Commercial Areas at FWS_001991.

Agency's discussion on translocations lack specificity.[226] The Administrative Record refutes Friends of Animals' assertion. The GCP's Section 2.1.6. is entirely dedicated to mitigation and minimization,[227] and the GCP discusses translocations in Section 5.1.1.[228] The discussion on translocations details when the translocations will occur; when translocations are feasible; the people and entities that will perform the translocations; and the benefits of translocations.[229] The GCP adequately discussed translocations and mitigation measures.

Additionally, Sections (III)(F)(1)-(2) of this opinion determined that the GCP will not significantly affect the quality of the human environment, which is the requirement necessary to trigger the National Environmental Policy Act's § 4332(C)'s requirements.

## IV.   ORDER

IT IS HEREBY ORDERED that Friends of Animals' Motion for Review of Agency Action[230] is DENIED.

Signed December 20, 2024.

BY THE COURT

David Nuffer
United States District Judge

---

[226] Friends of Animals at 46; Agency Response at 46.

[227] GCP at FWS_002131-36.

[228] GCP at FWS_002130-31.

[229] GCP at FWS_002130.

[230] Plaintiff's Opening Brief docket no. 74, filed March 25, 2021.